777 A.2d 919

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MAURICE WILLIAMS, DEFENDANT–APPELLANT.

Argued February 27, 2001—Decided July 30, 2001.

350

*Bernadette N. DeCastro*, Assistant Deputy Public Defender, argued the cause for appellant, (*Peter A. Garcia*, Acting Public Defender, attorney).

*Jordana Jakubovic*, Deputy Attorney General, argued the cause for respondent, (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

*Jessica A. Roth*, argued the cause for amicus curiae, Association of Criminal Defense Lawyers of New Jersey, (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione*, attorneys; *Ms. Roth* and *Lawrence S. Lustberg*, on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

In this appeal, we must determine whether a decedent's statement that he "shot a kid" is admissible as a declaration against penal interest in a criminal prosecution of a defendant who was charged with shooting two children and, if so, whether the trial court's failure to admit the statement was harmless error. We conclude that the statement should have been admitted at defendant's trial and that failure to do so was not harmless error. We therefore reverse and remand for a new trial.

I

Although the testimony concerning this horrific crime is often conflicting and convoluted, we discern the essential facts to be as follows. In October of 1995, two children were shot through the window of their Atlantic City apartment. One child, Kareem Davis, age four, died. The other, Taqiyy Davis, age two, suffered a severed spinal cord and remains permanently paralyzed from the chest down. On the evening of the shooting, defendant,

fifteen-year-old Maurice Williams, was at his mother's house with his fourteen-year-old girlfriend, G. G. testified that at some point during the evening defendant left the house for fifteen minutes. After defendant returned to the house, he changed his clothes, and told G. that he had just shot out a window in retaliation for a previous attack on his cousin by Faheem Davis. Davis had been babysitting at the apartment earlier that evening and the two children shot were his nephews.

The next morning defendant spoke to a friend named Andre Brickhouse, mentioned the shooting the prior evening, and told him that he "shot through the window and was shooting at Faheem Davis." That night defendant and G. were watching the six o'clock news, which reported that the two children had been shot. G. questioned defendant about his possible involvement, and defendant stated, "I didn't mean to do it, I didn't know anyone was in the room." G. later told her cousin what defendant had said to her, and the cousin in turn called G.'s mother. Concerned for her daughter's safety, G.'s mother called the police and relayed the information she heard from G.'s cousin about defendant's alleged involvement in the shooting.

The next day defendant and his father, Cyrus Nelson, were asked to report to the Prosecutor's Office, and they arrived shortly before noon. Defendant's father gave the officers permission to interview defendant. At approximately 4:30 p.m., Detective Henry White, Jr. entered the interview room while defendant was explaining to the detectives already there that he witnessed someone he referred to as Ali Abdullah stand in the middle of the street and shoot into the window of the apartment. Defendant told detectives that he witnessed the shooting from two blocks away. The detectives challenged defendant's story and defendant began to appear nervous. Detective White explained to defendant that, if he did shoot into the apartment, it would be in his best interest to tell the detectives that he was not aware that there were two children inside the apartment at the time of the shooting. Defendant was very concerned about the possibility of prison

because he would not be able to take care of his younger brother and sister. Defendant also was concerned about retaliation against his brother and sister if he admitted guilt. The detectives began explaining the different sentencing implications of murder and manslaughter. Detective Sergeant William James McIntyre, supervisor of the Major Crimes Unit, entered the room. Defendant then stated, "All right, I did it, I shot through the window. I didn't know anyone was inside." Defendant then asked: "What kind of time am I going to get? I'll plead guilty right now if you promise I'll do less than five years." Another investigator then entered the interview room announcing that an attorney representing defendant had arrived. Sergeant McIntyre ordered all police personnel to cease questioning and exit the room immediately.

During the interrogation, defendant's father left defendant alone with the investigating officers in the interview room a number of times because the father was not feeling well. In fact, at the time of defendant's admission to the police, his father had stepped outside of the building for some fresh air. Nelson testified that he heard yelling and screaming noises coming from the interview room and sounds of something being thrown. He banged on the locked outside door of the building but no one let him in until he started banging on the outside portion of the air conditioning unit of the interview room where defendant was located. When Nelson went back into the building, the detectives told him that defendant had just admitted to the shooting.

Defendant contends that he asked for a lawyer ten to fifteen times but was denied access to counsel by the interviewing officers. Defendant claimed that he told the officers what they wanted to hear only so that he could go home to make sure that his mother was all right and to take care of his younger brother and sister.

At trial, defendant testified on his own behalf. He denied being a member of any gang or knowing Faheem Davis. Defendant claimed that his friend, Andre Brickhouse, came to his house the

day before the shooting and asked him to hold a bag containing a gun. On the night of the shooting, Brickhouse returned to pick up the bag at around 10:00 or 10:30 p.m. Defendant claimed that he went out of the house for only a few minutes with his younger brother to buy Tylenol for his mother. On the way to the store, he saw Derrick Martin, who was allegedly carrying the same bag that Brickhouse had picked up from defendant's house. Defendant saw Martin reach into the bag and, although he did not see the gun, defendant heard two or three shots. Defendant testified that he grabbed his brother and went home.

Defendant further testified that after arriving home he told his girlfriend, G., that he had heard gun shots fired. When she asked who did it, defendant replied: "Why do you want to be so curious? If it wasn't me, don't worry about it." G. answered that it was probably defendant who did it. Defendant retorted: "You never know who could have did it." Defendant testified that he did not tell G. about Martin because he was afraid she would "r[u]n her mouth." Defendant feared that if Martin knew he saw him commit the crime he would "shoot up [his] house just like he did the other one." Defendant testified that when he attempted to tell the police that Martin was responsible, they informed him that Martin had an alibi.

Defendant also testified that Brickhouse told him the day after the shooting that Martin had killed someone the night before. Defendant testified that Brickhouse confided in defendant because of the possibility that defendant's fingerprints might be on the bag with the gun. According to defendant, he spoke to Martin later that evening. Defendant stated that Martin warned him not to say anything about what he saw. Defendant asked Martin whether he realized that a "little kid was involved." Martin responded by saying that he did not know anyone was in the house. Defendant's testimony continued:

And I asked him did he really care about what was going on. He said yeah, but ain't nobody seen nothing but me, so, and I know you ain't going to start talking, and I was like, no, and he was like, well, nobody won't [know] nothing then.

Defendant testified that Martin told him that something would "happen" to defendant or his younger siblings if defendant said anything to anyone about Martin.

Defense counsel attempted to introduce the testimony of Hakim Callender. Callender had been charged with the subsequent murder of Derrick Martin who, as indicated above, defendant asserted was responsible for the shooting of the children. When Callender was asked about a conversation that he had with Martin, Callender's attorney objected and advised his client to assert his Fifth Amendment right. After a number of other objections, defense counsel asked:

> Q   Did you at any time hear Derrick Martin bragging about the killing of Kareem Davis or Taqiyy Davis?
>
> CALLENDER'S ATTORNEY: Hearsay objection.
>
> A   No, I heard him mention it when we was outside in the front arguing. He was saying some stuff.
>
> Q   Where was this?
>
> A   In front of the rec.
>
> Q   What is the rec?
>
> A   The place where I shot him at.

From that point on, Callender invoked the Fifth Amendment on the advice of counsel and did not answer any further substantive questions other than to state that he did not remember when his conversation with Martin took place.

Other testimony throughout the trial also alluded to Martin as a possible perpetrator. One investigating officer familiar with Martin testified that he observed Martin and two other men approach the crime scene within a half hour of the shooting. The officer also testified that when the three men entered the crime scene area, he stopped them and patted them down for weapons. The trio told police that they went to the scene of the shooting because they had heard that a friend of theirs had been assaulted by Faheem Davis.

The State introduced evidence to establish that the distance between defendant's house and the site of the shooting took only three minutes and twenty-two seconds to walk, indicating that it

was possible for defendant to leave his house, walk to the scene of the shooting, shoot into the apartment and return to his residence within a fifteen-minute period. A firearms expert testified that defendant's height would permit him to fire the gun at the calculated trajectories. That expert also testified that the trajectory evidence was "consistent with two aimed shots aimed at the two victims."

Because defendant asserted that it was Derrick Martin who fired the shots into the apartment, the State noted at trial that police questioned Martin, and that Martin established his whereabouts at the time of the shooting. Martin's alibi was corroborated by two others, Martin's brother, Charles, and a friend named Donaldson.

The jury found defendant guilty of murder, attempted murder, aggravated assault, possession of a weapon for an unlawful purpose, possession of a handgun without a permit, tampering with physical evidence, and hindering apprehension. Although not mentioning any mitigating factors, the trial court found that the aggravating circumstances substantially outweighed the mitigating factors and sentenced defendant to a life term with a thirty-year parole disqualifier for the murder count to run consecutive to a twenty-year term with a ten-year parole disqualifier for attempted murder.

Defendant appealed. In an unpublished opinion, the Appellate Division found no reversible error in respect of various issues raised by defendant but remanded

> the matter to the trial court for the purpose of conducting a proceeding at which Hakim Callender will be directed to answer the questions posed to him by defense counsel concerning what Martin said about the shooting of the Davis boys.

Because the trial court failed to consider any mitigating factors, the Appellate Division also remanded to consider appropriate mitigating factors such as defendant's youth, and other factors relating to his family and mental capacity, which "should have been considered by the [sentencing court] as mitigating factors in

determining whether a prison term closer to the minimum ordinary term for murder would not be more appropriate."

During the remand hearing, defense counsel asked Hakim Callender about the conversation he had with Derrick Martin concerning the shooting incident.

A. It was more like an argument. He said that he—that he shot a kid, and he told me to come around the corner.

Q. He said that he shot a kid. Did he give you any details concerning it?

A. No, no details.

Q. Did he give you any approximate time frame when this event occurred?

A. No.

Q. How did the circumstances come up where he told you that he shot a kid? Why would he tell you something like that, do you know?

A. Because we was arguing, I guess.

Q. What were you arguing about?

A. Not getting in a party, because I was talking to this girl, and he said that was his girlfriend, and so he started.

. . . .

Q. Back to the statement that Mr. Martin made to you, did he say that he shot a kid?

A. Um-hum.

Q. And you're saying that he didn't provide you with any other details?

A. No.

. . . .

Q. Where did the shooting take place?

A. He didn't tell me.

. . . .

Q. Can you provide the court with any other details concerning the conversation that you and Mr. Martin had concerning the shooting?

A. He just told me that he shot some kid, and he told me to come around the corner. I guess he showed me his gun because we was arguing.

. . . .

Q. What is—you know the reason why he asked you to come around the corner?

A. Probably to shoot me, I don't know.

Callender supplied no further details regarding the shooting.

The trial court determined that Martin's alleged statement to Callender did not qualify as a declaration against interest, *N.J.R.E.* 803(c)(25), because the statement did not expose Martin

to criminal liability due to a lack of specific details concerning who was shot or where the shooting took place. Concerning the remand on sentencing, the trial court acknowledged defendant's youth and family problems but found no mental incapacity. The trial court found that the aggravating factors outweighed the mitigating factors and therefore reaffirmed defendant's life sentence. The Appellate Division affirmed, and we granted certification. 165 *N.J.* 527, 760 *A.*2d 781 (2000).

## II

The question presented is whether Martin's statement was admissible as a declaration against interest. The statement on its face exposed Martin to criminal liability. Because the question of the statement's admissibility primarily turns on the words of the statement itself rather than the extrinsic circumstances pertaining to the reliability of the statement, such as the level of the statement's specificity, the lower courts erred in concluding that the statement was inadmissible.

■ " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *N.J.R.E.* 801(c). Hearsay is generally inadmissible, *N.J.R.E.* 802, except if it falls within one of the hearsay exceptions. *State v. Phelps,* 96 *N.J.* 500, 508, 476 *A.*2d 1199 (1984). A statement against interest, *N.J.R.E.* 803(c)(25), is one such exception. That rule provides:

A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against an accused in a criminal action only if the accused was the declarant.

[*N.J.R.E.* 803(c)(25).]

■ "The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably. Consequently, statements that so disserve the declarant are

deemed inherently trustworthy and reliable." *State v. White*, 158 *N.J.* 230, 238, 729 *A.*2d 31 (1999). In *White*, we held "that a declarant's statements exculpating a defendant should be admitted as evidence under the statement-against-interest exception to the hearsay rule if . . . they subject the declarant to criminal liability." *Id.* at 244, 729 *A.*2d 31. We based that conclusion in part on the *Report of the New Jersey Supreme Court Committee on Evidence* (Mar.1963), that stated:

> *[A] statement against penal interest should be admissible if it exculpates a defendant on trial and for the same policy reason which prevents it from being used against him, namely, to protect an innocent person.* While it is true that a guilty defendant might suborn such a statement, nevertheless criminal defendants as a class should be able to use such statements on the basis that an innocent man would otherwise be denied the necessary evidence of a statement which clears him of the crime.
>
> [*White, supra*, 158 *N.J.* at 244, 729 *A.*2d 31.]

"It is clear that . . . where the crime was known to have been committed by a single person, because the out-of-court confession of that crime by one other than the defendant would have a strong tendency to exculpate the defendant [the confession] would, therefore, certainly be admissible under" *N.J.R.E.* 803(c)(25). Biunno, *Current N.J. Rules of Evidence*, comment on *N.J.R.E.* 803(c)(25) (2001).

"[E]xtrinsic circumstances bearing on the general reliability or trustworthiness of the declarant's statement" do not pertain to the admissibility of the statement, which instead must be determined on "a statement's self-incriminating character" alone. *White, supra*, 158 *N.J.* at 240, 729 *A.*2d 31. Although extrinsic circumstances of reliability are irrelevant to admissibility,

> they nevertheless occupy an important place in the trial presentation of relevant evidence. Once the declarant's out-of-court incriminating statement is admitted into evidence, the jury must determine the statement's probative worth. The jury should undertake an unfettered and full consideration of all the circumstances surrounding the declarant's confession and disregard the statement or any part thereof if it finds the statement not credible.
>
> [*Id.* at 246, 729 *A.*2d 31.]

*See also* Biunno, *supra*, comment on *N.J.R.E.* 803(c)(25) ("It is, of course, clear that the fact that a statement is admissible under

this hearsay exception does not mean that it is necessarily credible, and juries must be instructed to look at the circumstances surrounding the statement to assess credibility.").

In *State v. Norman*, 151 *N.J.* 5, 697 *A.*2d 511 (1997), two defendants ambushed the victim and the victim's friend, whom the defendants believed was a competing drug dealer. *Id.* at 11–12, 697 *A.*2d 511. The victim and his friend fled the building that they had been lured into, and the defendant and co-defendant chased after them with machine guns. *Ibid.* After crashing through a plate-glass front door and running to the street, both defendants fired shots. *Id.* at 12, 697 *A.*2d 511. The victim, Holmes, was shot and killed. *Ibid.* Both defendants made statements, one blaming the other and one asserting that both fired shots and that it could have been either that killed the victim. *Ibid.* A primary issue in both cases was whether the defendant or the co-defendant had been the shooter. *Id.* at 13, 697 *A.*2d 511.

During the course of considering whether counsel performed ineffectively due to a conflict of interest, this Court addressed the admissibility of certain testimony. *Id.* at 30, 697 *A.*2d 511. Specifically, Alvin, the defendant's brother, claimed that the defendant admitted to him that he had shot the victim, and stated that the co-defendant had not. *Id.* at 21, 697 *A.*2d 511. We noted that "[o]ut-of-court statements that are against the penal interest of the declarant are admissible if the statements were against the declarant's interest at the time made," and concluded that the defendant's statement to Alvin was admissible under *N.J.R.E.* 803(c)(25).

## III

In this appeal, defendant sought to admit Callender's testimony regarding Martin's statement that he "shot a kid." Martin's statement could have subjected him to criminal liability for numerous offenses including murder. The statement was on its face inculpatory, much as was the statement in *Norman.* Therefore, the statement falls within *N.J.R.E.* 803(c)(25).

The Appellate Division concluded that "the context in which Martin made the statement and the vagueness of its content was such that the statement would not qualify as inherently trustworthy within the meaning of *N.J.R.E.* 803(c)(25)." According to the Appellate Division,

> [t]he statement, made in the context of an argument over a girl while flashing a gun, was more in the nature of a show of bravado than a confession. This is especially so when one considers that no details were given by Martin that could have been used to prosecute him of a specific offense.

However, the Appellate Division improperly emphasized the extrinsic circumstances surrounding the statement's reliability rather than the language of the statement on its face. Martin's statement that he "shot a kid" undoubtedly was against his penal interest. That the statement was made during an argument over a young woman and the fact that no details were given do not undercut the statement's facially inculpatory nature. In *Norman,* we did not consider extrinsic circumstances bearing on the reliability of the statement, such as the fact that the defendant there could have been engaging in a "show of bravado" to impress Alvin. We did not do so because those circumstances pertain solely to the weight given to the statement, not its admissibility. Moreover, we did not there inquire whether the statement contained sufficient details regarding the crime beyond the defendant's bare admission that he, rather than the co-defendant, shot the victim. That also demonstrates that the specificity of the statement does not bear on admissibility, but pertains solely to the weight given the statement.

▮ The next question is whether the failure to admit that statement at trial was harmless error. "An error is harmless unless there is a reasonable doubt that the error contributed to the verdict." *White, supra,* 158 *N.J.* at 247, 729 *A.*2d 31. In *White,* we concluded that portions of a co-defendant's statement exculpating the defendant were improperly excluded by the trial court. *Id.* at 245, 729 *A.*2d 31. We also concluded that those portions of the statement may have affected the jury's view of the evidence against White. *Id.* at 247–48, 729 *A.*2d 31. "Where we

cannot be certain that introduction of defendant-exculpatory material would not have altered the outcome, we 'should not speculate.' " *Id.* at 248, 729 *A*.2d 31 (quoting *Norman, supra,* 151 *N.J.* at 41, 697 *A*.2d 511 (Stein, J., dissenting)).

In this appeal, defendant testified that he saw Martin commit the crime. Other testimony indicated that Martin was at the scene within thirty minutes after the shooting. If the disputed testimony had been admitted at trial, Callender would have repeated Martin's statement that he "shot a kid." That testimony would have corroborated, to some degree, evidence of Martin's involvement. In view of that evidence, admission of Martin's statement could have influenced the jury. Although we are unsure that it would have that effect, we "should not speculate." Therefore, we conclude that the failure to admit Callender's testimony was not harmless error.

Our conclusion obviates the need to address whether failure to admit the testimony violated defendant's constitutional right to present evidence of third-party guilt. See *White, supra,* 158 *N.J.* at 248, 729 *A*.2d 31 (declining to address question whether failure to admit portions of co-defendant's statement exculpating defendant as statements against interest was also constitutional infirmity) (citing *Chambers v. Mississippi,* 410 *U.S.* 284, 302–03, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.*2d 297, 312–13 (1973)); *see also State v. Timmendequas,* 161 *N.J.* 515, 620, 737 *A*.2d 55 (1999) ("A defendant has the right to 'advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made.' ") (quoting *State v. Garfole,* 76 *N.J.* 445, 453, 388 *A*.2d 587 (1978)); *State v. Koedatich,* 112 *N.J.* 225, 297, 548 *A*.2d 939 (1988) ("It is well established that a defendant is entitled to prove his innocence by showing that someone else committed the crime."), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). "As we have previously explained, courts should not reach constitutional questions unless necessary to the disposition of the litigation." *O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 240, 624 *A*.2d 578 (1993); *see also Donadio v. Cunning-*

*ham*, 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971); *State v. Zucconi*, 50 *N.J.* 361, 364, 235 *A.*2d 193 (1967); *Ahto v. Weaver*, 39 *N.J.* 418, 428, 189 *A.*2d 27 (1963); *State v. Salerno*, 27 *N.J.* 289, 296, 142 *A.*2d 636 (1958); *State v. Fair Lawn Serv. Ctr., Inc.*, 20 *N.J.* 468, 470–71, 120 *A.*2d 233 (1956).

## IV

In sum, we conclude that Martin's statement subjected him to criminal liability for any one of several offenses, including murder. The statement was therefore admissible as a declaration against interest under *N.J.R.E.* 803(c)(25). Because admission of that statement, combined with defendant's testimony implicating Martin and the additional testimony placing Martin at the scene of the crime shortly after the shootings, may have influenced the jury, we cannot say that failure to admit the statement was harmless error.

Reversed and remanded for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.