840 A.2d 271

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RICHARD M. BECKLER, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 3, 2003—Decided January 16, 2004.

18

Before Judges KING, LINTNER and LISA.

*Joseph J. Benedict,* argued the cause for appellant (*Benedict and Altman,* attorneys; *Mr. Benedict* and *Doris E. McNeil,* on the brief).

*Mary R. Juliano,* Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney; *Mark P. Stalford,* Assistant Prosecutor, of counsel).

The opinion of the court was delivered by

LINTNER, J.A.D.

On February 25, 2000, a Monmouth County Grand Jury returned Indictment No. 00–02–0366 against defendant Richard Beckler, charging him with third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a (Count One); third-degree attempting to lure a child, *N.J.S.A.* 2C:13–6 (Count Two); and third-degree attempting to engage in prostitution with a child, *N.J.S.A.* 2C:34–1b(7) (Count Three). Following a three day *Miranda*[1] hearing, which included testimony from defendant's treating psychiatrist, Dr. Frank Abenante, the trial judge, on December 12, 2000, suppressed defendant's statements made to police immediately after being given his *Miranda* rights. However, he permitted the use of defendant's spontaneous statements made to police during his processing, subject to further determination under *N.J.R.E.* 404(b) prior to trial. One month later the judge found that defendant's spontaneous statements to the police were admissible as 404(b) evidence.

Defendant, who was twenty-five years old at the time of the trial, suffers from cerebral palsy and several neurological, behavioral, and intellectual problems, rendering him the functional equivalent of a twelve or thirteen-year-old. Intellectually, he is equivalent to a seven to eight-year-old. On October 11, 2001, the

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

State presented the testimony of Dr. Daniel Paul Greenfield, a Board Certified psychiatrist, who essentially agreed with Dr. Abenante's opinion previously given at the *Miranda* hearing, that defendant was not competent to stand trial. Dr. Greenfield also opined that defendant was a danger to himself and others. Before ruling on defendant's competency, the judge ordered that defendant be examined by a qualified psychiatrist or licensed psychologist through the Department of Human Services. On December 6, 2001, the judge heard testimony from Dr. Peter D. Paul, a licensed clinical psychologist, holding a Ph.D. from Hofstra University. Dr. Paul rendered a contrary opinion, believing defendant was competent to stand trial. Accepting Dr. Paul's opinion as credible, the judge found defendant competent to stand trial.

Five weeks before the commencement of trial, an evidentiary hearing was held, following which the judge permitted testimony concerning an event occurring almost two years after the alleged offense (the Bragen incident) in which defendant, who was on medication, allegedly patted a ten-year-old boy on the buttocks at an amusement park. Testimony regarding the Bragen incident was permitted for the limited purpose of allowing the State to attack an opinion to be offered by defendant's medical expert that defendant was suffering from diminished capacity at the time of the offense because he had not taken his required medication.

A jury trial commenced on April 2, 2002. Defendant did not offer any evidence of diminished capacity and, therefore, testimony concerning the Bragen incident was never admitted. On April 4, 2002, defendant was found guilty on all counts. Defendant was sentenced to a five-year probationary term conditioned upon his submitting to urine and DNA testing, continued psychiatric treatment, entrance into a sex offender treatment program, compliance with the provisions of Megan's Law, *N.J.S.A.* 2C:7–1 to –19, and no contact with the victim. Defendant appeals, raising the following points:

*Point I*

THE TRIAL COURT ERRED IN FINDING DEFENDANT COMPETENT TO STAND TRIAL.

*Point II*

THE TRIAL COURT ERRED IN ITS DETERMINATION THAT DEFEN-
DANT'S STATEMENTS DURING ARREST PROCESSING WERE ADMISSI-
BLE.

A. The defendant's statements during arrest processing were not voluntarily,
knowingly and intelligently made and, therefore, should have been excluded.

B. The arrest-processing statements were not admissible under *N.J.R.E.*
404(b).

C. Limiting instructions were required, but not given, at the time the evidence
was introduced, but were incorporated in the jury charge. However the jury
charge was misleading in that it made it appear the defendant had actually
committed the act described in his arrest-processing statement, an issue of
credibility for the jury to decide. (Not raised below.)

*Point III*

THE TRIAL COURT ERRED WHEN IT FOUND THAT EVIDENCE RE-
GARDING THE BRAGEN INCIDENT, WHICH OCCURRED NEARLY TWO
YEARS AFTER THE SUBJECT INCIDENT, WAS ADMISSIBLE AT TRIAL.

We reverse and remand for new trial because we are
satisfied that the spontaneous statements made by defendant
during the time he was being processed for arrest, after cessation
of questioning, were improvidently admitted into evidence. We
recognize that our review of a trial judge's determination of
competency is "typically, and properly, highly deferential." *State
v. Moya,* 329 *N.J.Super.* 499, 506, 748 *A.2d* 604, 607 (App.Div.),
*certif. denied,* 165 *N.J.* 529, 760 *A.2d* 783 (2000). Nevertheless, we
decline to decide whether the judge erred in his decision finding
defendant competent as the issue of defendant's current compe-
tency to stand trial can be raised on remand, should this matter be
retried.

The following relevant facts were educed by the State at the
pretrial evidentiary hearings and trial. On September 28, 1999,
defendant, then age twenty-two, was sitting on a park bench in
Eatontown listening to a headset radio and playing with a "fart
toy." Eventually, he walked toward a basketball court where J.W.,
a high school junior, was riding a bicycle. Defendant asked J.W.
about the availability of male prostitution. J.W. told defendant to
go to Asbury Park. Defendant also talked with J.W. for fifteen to
twenty minutes about sexual encounters defendant had with oth-

ers when he was younger. J.W. left the park to search for his friend T.M., for whom he had been waiting. After finding T.M., age fourteen, J.W. and T.M. returned on their bicycles to the park despite J.W.'s earlier conversation with defendant, which made him feel "weird" and "uncomfortable."

According to J.W., when they returned, defendant, as before, was seated listening to his radio and playing with the toy. J.W. stated that defendant approached the two and started to talk about pornographic tapes. However, according to T.M., when they arrived at the park, defendant was shooting a basketball and never approached them nor did he make T.M. feel uncomfortable. After waiting for friends who never showed, J.W. left first, followed by T.M., who went to McDonald's to get a drink after which he headed home.

T.M. claimed that while he was on his way home on his bicycle, he again encountered defendant, who proceeded to discuss stories of his sexual exploits. Defendant propositioned T.M., telling T.M. that he would perform oral sex on T.M. and allow T.M. to perform anal sex on him for which he would pay T.M. $100. T.M. claimed that defendant suggested they go to Fort Monmouth Golf Course, however, he told defendant that he had to leave. Then defendant told T.M. that he would meet T.M. the next evening at 7:30 p.m. at the Lakeview Terrace Apartments. Trying to get away, T.M. indicated he said "all right" and "split across the street." After arriving home, T.M. did not tell his mother about the incident. However, the next day he related what had happened to J.W., after which they reported the encounter to their school guidance counselor, who in turn notified the police.

Defendant was arrested one week later on October 8, 1999, by Detective Michael Goldfarb and Sergeant Michael Panchak of the Eatontown Police Department. At the station, the officers gave defendant his *Miranda* rights. Defendant signed a waiver card. Upon questioning it became clear to both officers from defendant's responses that he did not understand what was happening. Among his responses was the statement that he didn't want to be

a "Megan's Law guy" and that he would tell them about sex with boys or teenagers if they could "make this go away." Accordingly, the officers ceased their efforts to take a statement.

After the officers stopped their questioning, Detective Goldfarb took defendant to another part of the station to process the arrest. According to Goldfarb, as they walked along, defendant "just started talking" spontaneously to him about various sexual acts he had with boys. Goldfarb related the following:

> Specifically he said that he performed oral sex on several boys and quote, some boys f——him in the ass. He said this happened on Fort Monmouth and in Eatontown. He said that they gave him money to do these things to him. He said that he tried to get boys in the park to have sex but they would not. And he talked about having voluntary sex with two male friends who had since moved away.

When asked by Goldfarb whether these people were people who defendant knew, defendant told him "no" and that they were "black or Hispanic males between fourteen and seventeen years old." Goldfarb conceded on cross-examination during the *Miranda* hearing that defendant never admitted that he did what the two victims claimed he did.

These events, occurring at headquarters following defendant's arrest, were established along with other evidence at the *Miranda* hearing. Following the hearing the trial judge determined that defendant did not voluntarily waive his *Miranda* rights, thus suppressing the statements made by defendant during custodial interrogation prior to cessation of questioning by the officers. Determining that the spontaneous statements made by defendant after cessation of questioning did not violate *Miranda* and that admissibility was subject to an *N.J.R.E.* 404(b) hearing, the judge observed:

> Now, not on *Miranda*, but I do think that subject matter of a 404 hearing, whether or not they come in because the statements that he made had nothing to do with this particular charge against him. It had to do with allegedly other victims in—I say allegedly because I don't think the police believed a word of what he was saying, but it had nothing to do with the victims in this case, it had to do with other alleged, in my mind, fantasy victims. So I think under 404 that would be another issue.

At the subsequent hearing to determine the admissibility of the post-cessation spontaneous statements,[2] the State argued that they were admissible under *N.J.R.E.* 404(b). Applying the four-part test enunciated in *State v. Cofield*, 127 *N.J.* 328, 338, 605 *A.*2d 230, 235 (1992), the judge determined the post-cessation statements were relevant to show "intent." He also determined that the statements were "certainly similar." Expanding his ruling on the first day of trial, the judge added:

> [T]here is no time frame set forth in the statements as I see. But I think what's significant is that these admissions, these statements were made reasonably close ... you know, at the time of his arrest in referring to those past incidents.
>
> And I don't feel that the temporal requirement would prevent the information in the context of this case from coming in.

Relying on *State v. Covell*, 157 *N.J.* 554, 725 *A.*2d 675 (1999), the judge determined that the evidence was clear and convincing pointing out that in his mind there was no doubt that defendant made the spontaneous statements to Detective Goldfarb. The judge observed "[w]hether those statements, talking about past acts or not are true I think will be up to the jury to determine." He did not think the State was "required to go and take a step backward and ... prove the underlying particular incident[ ] ... when defendant is making an [admission] of past similar act[s]."

Finding the fourth *Cofield* prong was established, the judge stated "the relevancy outweighs the prejudice in this particular case." The judge, on the first day of trial, citing to *Covell*, added that he was satisfied that the defense had not met its burden saying "in situations where intent and motive is the issue, that is an extremely high burden on the defense to show that the prejudice outweighs the probative value." He also noted that, although not specifically addressed by the parties, the post-cessation statements qualified as an admission under *N.J.R.E.*

---

[2] At the hearing there was also argument on the admissibility of the statements allegedly made by defendant to J.W. prior to the encounter with T.M. However, the judge withheld deciding that issue, deciding that there should be a hearing prior to trial to determine what comments were made.

803(b)(1), stating that they were made voluntarily and were relevant.

At trial the defense called defendant's father who testified about his son's cerebral palsy and dystonia (brain tremors). He described how defendant goes to the Ocean Monmouth County Cerebral Palsy School where he receives education and is employed part time as a cook, for which he is paid twenty dollars per week, which covers his bus transportation. Defendant has no other source of income other than a monthly Social Security stipend, which is paid to his father who handles defendant's purchases because his son is incapable of handling money. According to defendant's father, his son was not likely to have the $100 he allegedly offered to T.M.

Defendant testified. He acknowledged that he was in the park on the day in question playing with a "fart toy." He observed J.W. riding his bicycle. According to defendant, J.W. approached him and initiated a conversation about X-rated videos. J.W. left and returned with T.M., at which time defendant and J.W. had some further discussion about X-rated videos. T.M. was not a party to the conversation. After both boys left the park, defendant went home. He denied ever encountering T.M. outside the park. He did not make any sexual proposals to T.M. and never offered T.M. $100. Defendant also denied telling Detective Goldfarb about the incidents with other boys. The defense also offered testimony from Dr. Frank Abenante, defendant's psychiatrist, concerning defendant's functional and intellectual equivalency.

On appeal, defendant argues that his post-cessation statements should have been excluded because they were not voluntarily, knowingly, and intelligently made, given his mental status. We conclude, however, that there was substantial credible evidence establishing that the post-cessation statements, although made while defendant was in custody, were unsolicited, spontaneous, and not made in response to "questioning or its functional equivalent." *State v. Ward,* 240 *N.J.Super.* 412, 418, 573 *A.*2d 505, 508 (1990).

We are, therefore, satisfied that the trial judge correctly found that they were not violative of *Miranda.*

■ We come to a different conclusion regarding the admissibility of defendant's post-cessation statements. *N.J.R.E.* 803(b)(1), an exception to the hearsay rule, provides that a statement can be admitted into evidence if the statement is offered against a party which is "the party's own statement, made either in an individual or in a representative capacity." "[A]s long as there are no *Bruton,*[3] *Miranda,* privilege or voluntariness problems, and subject to *N.J.R.E.* 104(c), the State may introduce at a criminal trial any relevant statement made by a defendant." *Covell, supra,* 157 *N.J.* at 572, 725 *A.*2d at 684.

■ *N.J.R.E.* 404(b) provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

The rule is one of "exclusion" rather than "inclusion" and is intended to bar admission of other crimes when such evidence is offered solely to establish the forbidden inference of propensity or predisposition. *State v. Nance,* 148 *N.J.* 376, 386, 689 *A.*2d 1351, 1355–56 (1997). However, *N.J.R.E.* 404(b) does not preclude other crime evidence in all instances. It allows admission of such evidence when relevant to prove some fact genuinely in issue. *State v. Marrero,* 148 *N.J.* 469, 482, 691 *A.*2d 293, 299 (1997); *State v. Oliver,* 133 *N.J.* 141, 151–54, 627 *A.*2d 144, 149–51 (1993). "Other crime" evidence is admissible where: (1) relevant to a material issue, (2) similar in kind and reasonably close in time to the act alleged, (3) clear and convincing, and (4) of sufficient probative value not to be outweighed by its apparent prejudice. *Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d at 235 (citing Abraham P.

---

[3] *Bruton v. United States,* 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968).

Ordover, *Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a),* 38 Emory L.J. 135, 160 (1989)).

We direct our attention to the concept of relevancy, a common requirement for admission of evidence under both *N.J.R.E.* 803(b)(1) and 404(b). Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. In support of its position, the State relies on three cases allowing prior sexual improprieties in evidence to show intent and motive. However, the factual circumstances in those cases are distinguishable from the facts here because the defendant's conduct in each of the cited cases was ambiguous and subject to two interpretations, one innocent and the other sexually improper, thus establishing the relevancy of the evidence sought to be admitted, i.e., "to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401.

For example, in *Covell, supra,* 157 *N.J.* at 559, 725 *A.*2d at 678, the defendant admitted waving to the female victim who was riding on a bicycle, explaining he was waving her across his path, contrary to the State's contention that he was gesturing for her to get into his car. Thus, his prior comments that he was only interested in young girls, not older women, was relevant to his intent and motive at the time he waved at the victim. Accordingly, in *Covell* there was a link between the 404(b) evidence and the defendant's conduct toward the victim of the crime.

In *State v. Zeidell,* 299 *N.J.Super.* 613, 615, 691 *A.*2d 866, 867 (App.Div.1997), *rev'd on other grounds,* 154 *N.J.* 417, 713 *A.*2d 401 (1998), defendant was charged with lewdness for masturbating in view of others while standing on the boardwalk in Asbury Park. Defendant claimed that he had merely pulled down his cut-off jeans to scratch a rash. Thus his prior lewdness and public masturbation charges were properly admitted to explain his motive and intent for dropping his shorts to engage in the subject offense.

In *State v. Cusick,* 219 *N.J.Super.* 452, 465, 530 *A.*2d 806, 814 (App.Div.) *certif. denied,* 109 *N.J.* 54, 532 *A.*2d 1118 (1987), the defendant admitted that at the time of the offense he "swung and cradled [his young victim] but denied ever having touched her genitalia or breasts...." We affirmed the admission of the defendant's prior criminal conduct, pointing out that his alleged fondling of the victim was "by itself, as consistent with accidental or grandfatherly touching as with lascivious intent," and admissible because it "was necessary to try to rebut any potential defense of mistake." *Ibid.* In *Cusick,* we noted that "unlike crimes such as homicide, where the perpetrator's intent may be inferred from the manner in which the offense was committed, the nature of the crimes of sexual assault and endangering the welfare of a child do not give rise to any such inference." *Id.* at 466, 530 *A.*2d at 814.

Here, unlike the facts in *Covell; Zeidell,* and *Cusick,* defendant's intent and motive were clear from the manner in which the offense was allegedly committed. There are no subtle nuances, interpretations, or ambiguities concerning what defendant purportedly said to T.M. T.M.'s claim, if believed by the jury, needs no extrinsic evidence to determine defendant's motive and intent. The very proposal made by defendant, as related by T.M., evidences defendant's motive or intent. Defendant's denial, on the other hand, is evidence that nothing ever happened, not that there was a misinterpretation by the victim or some other reason justifying defendant's engagement in a specific type of conduct.

On appeal, the State argues that "[b]y demonstrating defendant's prurient interest in young males, particularly blacks and Hispanics, the [offending] statements also 'fairly explained' defendant's criminal behavior." The State's argument, however, misses the mark as it fails to recognize that the very action allegedly perpetrated by defendant bespeaks the criminal intent and motive to commit the offense with which he was charged. Under these circumstances, the admission of statements to demonstrate defendant's prurient interest was tantamount to establishing the forbidden inferences of propensity or predisposition. Thus, the post-

cessation statements, although made by defendant and offered against him by the State, did not possess the necessary relevancy "to prove or disprove a fact of consequence," to support admission under *N.J.R.E.* 803(b)(1) or *N.J.R.E.* 404(b).

■ We add the following additional observations respecting other bad acts evidence and the requirements for admission under *N.J.R.E.* 404(b) and *Cofield.* Where the occurrence of a prior bad act is disputed, "a plenary evidentiary hearing (see *N.J.R.E.* 104) is held to determine whether the prior bad act occurred, and whether the party against whom the evidence is sought to be admitted actually committed the prior bad act." *State v. Moorman,* 286 *N.J.Super.* 648, 661, 670 *A.*2d 81, 87 (App.Div.1996). The third *Cofield* prong requires proof by clear and convincing evidence. Here, the circumstances, specifically defendant's cognitive deficit, points to a certain lack of reliability of the statements made by defendant. Even the trial judge, although convinced the statements were made, did not think the police believed a word defendant was saying, and that the statements had nothing to do with the victim but instead with "fantasy victims." Thus, although the statements were arguably voluntary as spontaneous and not solicited, we are satisfied that the requisite clear and convincing evidence of what actually occurred was absent. We are equally satisfied that the circumstances under which the statement sought to be admitted did not provide strong indicia of reliability justifying admission as an exception to the hearsay rule. *See State v. Williams,* 169 *N.J.* 349, 358–59, 777 *A.*2d 919, 924–25 (2001); *In re C.A.,* 146 *N.J.* 71, 95, 679 *A.*2d 1153, 1165 (1996); *State v. Phelps,* 96 *N.J.* 500, 508, 476 *A.*2d 1199, 1203 (1984).

■ Finally, we find no error with the judge's application of *N.J.R.E.* 404(b) and the *Cofield* criteria in permitting the State to present evidence of the Bragen incident for the limited purpose of attacking defendant's medical expert's opinion that defendant suffered from diminished capacity at the time of the offense as a result of his failure to take his medication.

Reversed and remanded for further proceedings.