SYLLABUS

*This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.*

**State v. Amandeep K. Tiwana (A-36-22) (087919)**

**Argued September 26, 2023 -- Decided November 20, 2023**

**SOLOMON, J., writing for a unanimous Court.**

The Court considers whether an investigating detective's self-introduction to defendant Amandeep K. Tiwana at her bedside in the hospital following a car crash initiated a custodial interrogation or its functional equivalent warranting the administration of warnings under Miranda v. Arizona, 384 U.S. 436 (1966).

On April 28, 2020, defendant, while driving in Jersey City, struck a police officer and collided with two police cruisers. Defendant and three injured officers were transported to Jersey City Medical Center. Defendant's blood alcohol content was 0.268%, three times the legal limit. Detective Anthony Espaillat of the Regional Collision Investigation Unit of the Hudson County Prosecutor's Office arrived at the hospital and spoke first to the injured officers in the emergency room.

Two uniformed police officers were stationed outside the curtain separating defendant's bed from other patients. Detective Espaillat walked up to defendant's bed, introduced himself as a detective with the Hudson County Prosecutor's Office, and explained that he was assigned to investigate the accident. Espaillat testified that, as soon as he had spoken, defendant immediately complained of chest pain and said "she only had two shots prior to the crash." Espaillat directed defendant not to make any other statements. He clarified that he did not come to the hospital to ask her questions and that he wanted to interview her at a later date at the Prosecutor's Office. The entire interaction lasted "less than five minutes." The next day, defendant went to the Prosecutor's Office and invoked her Miranda rights.

A grand jury indicted defendant for three counts of assault by auto. Pretrial, the State moved to admit defendant's statement at the hospital. Following an evidentiary hearing, the trial court denied the State's motion and the Appellate Division affirmed. Both courts found that a custodial interrogation occurred at the hospital and the detective's failure to give Miranda warnings rendered defendant's statement inadmissible. The Court granted leave to appeal. 253 N.J. 431 (2023).

1

**HELD:** Defendant was in custody at the hospital in light of the police presence around her bed area. But no interrogation or its functional equivalent occurred before her spontaneous and unsolicited admission. Miranda warnings were therefore not required, and defendant's statement -- that she "only had two shots prior to the crash" -- is admissible at trial.

1. To protect a suspect's right against self-incrimination, law enforcement officers must administer Miranda warnings when a suspect is in police custody and subject to interrogation. The parties do not dispute that defendant was in custody at the hospital. The sole issue is whether Detective Espaillat interrogated defendant in violation of his duty to first inform her of her right to remain silent. (pp. 10-11)

2. The United States Supreme Court in Rhode Island v. Innis clarified that "interrogation" for Miranda purposes occurs when a suspect "is subjected to either express questioning or its functional equivalent," which may include "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 300-01 (1980). But the Supreme Court stressed that the police "cannot be held accountable for the unforeseeable results of their words or actions." Id. at 301-02. (pp. 11-12)

3. The Court reviews several New Jersey cases applying the Innis interrogation standard. For example, in State v. Hubbard, the Court concluded that the defendant was interrogated by police because "the targeted questions reflect[ed] a clear attempt on the part of the detective to cause defendant to incriminate himself." 222 N.J. 249, 272 (2015). However, in State v. Beckler, the Appellate Division upheld the admissibility of the defendant's custodial statements because they "were unsolicited, spontaneous, and not made in response to questioning or its functional equivalent." 366 N.J. Super. 16, 25 (App. Div. 2004). (pp. 13-16)

4. Here, defendant was not subject to a custodial interrogation or its functional equivalent when she stated that she "only had two shots prior to the crash." No questioning occurred and Espaillat could not have foreseen that his introduction was reasonably likely to elicit an immediate incriminating response. Rather, defendant spontaneously made an unsolicited incriminating statement while in custody. The trial court and Appellate Division relied heavily on the three police officers in or just outside defendant's bed area at the time Espaillat introduced himself. That fact alone may establish custody, but it does not establish interrogation. (pp. 16-18)

      **REVERSED and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE SOLOMON's opinion.**

SUPREME COURT OF NEW JERSEY
A-36 September Term 2022
087919

State of New Jersey,

Plaintiff-Appellant,

v.

Amandeep K. Tiwana,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 26, 2023 | November 20, 2023 |

Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for appellant (Esther Suarez, Hudson County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the briefs).

Emily K. Graham, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Emily K. Graham, of counsel and on the briefs).

Steven K. Cuttonaro, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Steven K. Cuttonaro, of counsel and on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

Following a car crash near the Holland Tunnel that left two police officers in critical condition, an investigating detective visited defendant, the driver of the car that struck the officers' vehicles, in the hospital. The detective approached and introduced himself to defendant and advised her that he was investigating the collision. In response, defendant complained of chest pain and stated that she "only had two shots [of alcohol] prior to the crash."

The trial court suppressed defendant's statement and the Appellate Division affirmed. Both courts found that a custodial interrogation occurred at the hospital and that the detective's failure to give Miranda warnings rendered defendant's statement inadmissible. We now reverse. As the parties agree, defendant was in custody at the hospital in light of the police presence around her bed area. But no interrogation or its functional equivalent occurred before her spontaneous and unsolicited admission. Miranda warnings were therefore not required, and defendant's statement -- that she "only had two shots prior to the crash" -- is admissible at trial.

I.

A.

Just after midnight on April 28, 2020, defendant Amandeep Tiwana, while driving on Route 139 in Jersey City, bound for the Holland Tunnel, struck a police officer and collided with two police cruisers. Three officers

2

were injured in the crash. Evidence obtained from defendant's car showed that she was traveling at eighty-two miles per hour prior to the crash; the posted speed limit was forty-five miles per hour.

Defendant and the injured officers were transported to Jersey City Medical Center. At around 1:00 a.m., following routine triage, hospital staff noted that defendant was "[s]table enough" to respond to questions but complained of pain in her chest and arms. A blood draw showed her blood alcohol content was 0.268%, three times the legal limit.

Detective Anthony Espaillat of the Regional Collision Investigation Unit of the Hudson County Prosecutor's Office was assigned to investigate the crash. Detective Espaillat arrived at the hospital at about 2:40 a.m. and spoke first to the injured officers in the emergency room. The emergency room consisted of a row of "beds divided by cloth curtains on both sides," with curtains further separating the beds from the rest of the room. The injured officers and defendant were all in the same room, "two or three beds" apart, separated by curtains. Two uniformed Jersey City police officers were stationed outside the curtain separating defendant's bed from other patients.

After speaking to the injured officers, Detective Espaillat approached defendant.[1]  He walked up to defendant's bed, introduced himself as a detective with the Hudson County Prosecutor's Office, and explained that he was assigned to investigate the accident.  Espaillat testified that, as soon as he had spoken, defendant "immediately . . . started complaining of . . . chest pain" and said "she only had two shots prior to the crash."

Detective Espaillat directed defendant not to make any other statements. He clarified that he did not come to the hospital to ask her questions and that he wanted to interview her at a later date at the Prosecutor's Office, where the conversation would be recorded.  The entire interaction lasted "less than five minutes," and Detective Espaillat was in the hospital for a total of fifteen minutes.  No other investigator spoke with defendant while she was in the hospital.

The next day, defendant went to the Prosecutor's Office as requested, and invoked her Miranda[2] rights.

---

[1]  The trial court noted that "Detective Espaillat and two other officers[] entered the room."  The record before us shows that the two officers were stationed near defendant's bed before Detective Espaillat arrived, not that the three approached defendant together.

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

B.

A Hudson County Grand Jury indicted defendant for three counts of assault by auto. Pretrial, the State moved to admit defendant's statement at the hospital that she "only had two shots prior to the crash." Following an N.J.R.E. 104(c) evidentiary hearing, the trial judge denied the State's motion.

Applying the two-pronged Miranda test for custodial interrogations, the court found under the first prong, whether defendant was in custody, that defendant was in custody in the hospital when she admitted that she had consumed alcohol before the crash. Under the second prong, whether defendant was subjected to interrogation, the judge found that defendant would have believed Detective Espaillat was there to question her, noting the presence of two other officers. The judge added that the officers "had reason to know that the presence of the three of them walking into a hospital room, where the [d]efendant was clearly not free to leave, may elicit an incriminating response or statement made by the [d]efendant." The judge stated that "actions, rather than words alone, by detectives or officers may . . . satisfy the requirement of interrogation."

The State moved for leave to appeal the trial court's decision and for a stay of the proceedings, both of which the Appellate Division granted.

5

On appeal, the State argued the trial court's ruling "yields the absurd result of requiring law enforcement officers to administer <u>Miranda</u> warnings every time they approach someone prior to introducing themselves." Further, the State contended it was "unforeseeable" that defendant would make an incriminating statement immediately after Detective Espaillat introduced himself.

Noting that the parties did not dispute whether defendant was in custody, the Appellate Division focused on whether defendant was subjected to interrogation by Detective Espaillat. The Appellate Division agreed with the trial court and rejected the State's argument that the lack of direct questioning meant defendant was not being interrogated. The Appellate Division found that, because the detectives were not there to render medical treatment, "the only reasonable understanding of their presence was to obtain information about a criminal investigation." Thus, the Appellate Division affirmed the trial court's suppression of defendant's statement, stating the court's analysis "was based on correct legal principles and was supported by the evidence found credible."

The State filed a motion for leave to appeal, limited to the admissibility of defendant's statement to police at the hospital, which this Court granted. 253 N.J. 431 (2023). We also granted leave to the Association of Criminal

6

Defense Lawyers of New Jersey (ACDL) and the Attorney General of New Jersey to appear as amici curiae.

## II.

### A.

The State asks us to reverse the Appellate Division and hold that defendant's hospital-bed statement was admissible despite the lack of Miranda warnings because it was not the product of interrogation or its functional equivalent under the standard established in Rhode Island v. Innis, 446 U.S. 291 (1980). It notes Detective Espaillat did not ask defendant any questions, allude to any details about his investigation, or invite any response. The State argues that, instead, defendant spontaneously and voluntarily complained of chest pain and announced that she had consumed two shots of alcohol prior to the crash. It contends that because Detective Espaillat could not have anticipated that defendant would blurt out incriminating information in response to his mere introduction, he did not interrogate defendant. The State observes that when unexpected incriminating statements are made by a defendant in custody in response to "non-investigative" statements by police, those statements fall short of the Innis standard.

The Attorney General agrees with the State and argues that Detective Espaillat's introductory remarks are not the type of "inherently coercive

7

conduct" that amounts to interrogation or its functional equivalent. The Attorney General contends that a reasonable officer could not expect that briefly introducing oneself would produce a spontaneous inculpatory admission.

B.

Defendant argues that the record supports the trial court's decision and that, under the totality of the circumstances, Detective Espaillat should have known that his decision to approach defendant was reasonably likely to elicit an incriminating response. Defendant asserts that Detective Espaillat had no legitimate purpose in approaching her, and his stated goal of "making contact" to advise her that she was under investigation was properly rejected by both the trial court and the Appellate Division. Defendant further claims that, under Innis, the only reasonable explanation for the detective's presence was that he was there to obtain information about a criminal investigation.

The ACDL agrees with defendant and asserts that the State cannot credibly argue police were present at defendant's bedside for a benign or innocent reason. The ACDL further asserts that the circumstances clearly indicate police were hoping to elicit an incriminating statement.

8

III.

We now turn to the issue before us -- whether the detective's self-introduction to defendant at her bedside initiated a custodial interrogation or its functional equivalent under Innis. Because we find that Detective Espaillat's introduction did not initiate a custodial interrogation, we reverse the judgment of the Appellate Division and remand to the trial court for further proceedings.

A.

We accord deference to the trial court's factual findings, State v. Elders, 192 N.J. 224, 243 (2007), and will uphold "factual findings in support of granting or denying a motion to suppress . . . when 'those findings are supported by sufficient credible evidence in the record.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). But we do not defer to a trial judge's legal conclusions, which we review de novo. State v. Rockford, 213 N.J. 424, 440 (2013).

Here, we review de novo the suppression of an incriminating statement under the Fifth Amendment to the United States Constitution and this state's common law, now codified in a statute and evidence rule. See U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."); N.J.S.A. 2A:84A-19 ("[E]very natural person

9

has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate . . . ."); N.J.R.E. 503 (same as N.J.S.A. 2A:84A-19).

The United States Supreme Court clarified the Fifth Amendment right against self-incrimination in Miranda by establishing safeguards "to protect a suspect's right against self-incrimination from the psychological pressures inherent in a police-dominated atmosphere that might compel a person 'to speak where he would not otherwise do so freely.'" State v. L.H., 239 N.J. 22, 41-42 (2019) (quoting Miranda, 384 U.S. at 467). To counteract the pressures inherent in custodial interrogation, the Court mandated a set of warnings that law enforcement officers must give a suspect before beginning an interrogation -- warnings that, in part, inform "the suspect that 'he has the right to remain silent' and 'that anything he says can be used against him in a court of law.'" Id. at 42 (quoting Miranda, 384 U.S. at 479).

The failure to administer Miranda warnings prior to a custodial interrogation "creates a presumption of compulsion," and any unwarned statements must be suppressed -- even when they "are otherwise voluntary within the meaning of the Fifth Amendment." Oregon v. Elstad, 470 U.S. 298, 307 (1985); see also State v. O'Neill, 193 N.J. 148, 170 (2007).

10

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. Therefore, whether a suspect must be informed of the rights under Miranda depends on (1) whether the suspect is in police custody, and (2) whether police subjected the suspect to interrogation. State v. Hubbard, 222 N.J. 249, 266 (2015). In resolving whether police conduct constitutes interrogation or its functional equivalent, we consider whether, under the circumstances, a police officer's questioning or the functional equivalent was "particularly 'evocative'" or "reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 303; accord State in Int. of A.A., 240 N.J. 341, 354 (2020).

The parties in this case do not dispute that defendant was in police custody at the hospital. The sole issue presented to this Court is whether Detective Espaillat interrogated defendant in violation of the State's duty to first inform defendant of her right to remain silent.

B.

The United States Supreme Court in Rhode Island v. Innis clarified the meaning of "interrogation" under Miranda, noting that "interrogation" for Miranda purposes "must reflect a measure of compulsion above and beyond

11

that inherent in custody itself."  446 U.S. at 298, 300.  The Court in Innis concluded that Miranda applies whenever a suspect is in police custody and "is subjected to either express questioning or its functional equivalent," which may include "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Id. at 300-01 (footnote omitted).[3]  The Court stressed that, although the latter portion of its definition of interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," the police nevertheless "surely cannot be held accountable for the unforeseeable results of their words or actions."  Id. at 301-02.

In Innis, officers arrested the defendant for robbery with a sawed-off shotgun but did not recover the firearm.  Id. at 293-94.  Innis received his Miranda warnings, declined to waive his rights, and insisted he speak with a lawyer.  Id. at 294.  While en route to the police station, officers transporting Innis commented to each other about the risk that students who attended a nearby school "might find a weapon" and "hurt themselves."  Id. at 294-95.  Innis interrupted the conversation and told the officers to "turn the car around so he could show them where the gun was located"; he then led police to

_____

[3]  We do not rely on State v. Barnes, 54 N.J. 1 (1969), which predated Innis and applied a different standard.

12

where he hid the weapon.  Id. at 295.  The Court found that Innis had not been subjected to interrogation because the police did not expressly question him.  Id. at 302.  Moreover, the dialogue between the two officers was not the "functional equivalent" of questioning because reasonable officers would not have known that their conversation was likely to elicit an incriminating response.  Ibid.

We applied the Innis interrogation standard in Hubbard, in which police interviewed the defendant at the police station about serious injuries to his five-month-old child.  222 N.J. at 254, 259.  A detective questioned Hubbard for approximately one hour, asking him to account for his whereabouts on the day of the incident, whether he loved his child, and whether he had ever been "frustrated with" or "resented the baby."  Id. at 271-72.  The detective never administered Miranda warnings or told Hubbard he was free to leave.  Ibid.

Emphasizing "the conditions, substance, and duration of the interview," we held that the detective's questioning constituted custodial interrogation and that Hubbard's statement had to be suppressed.  Id. at 272.  We concluded that Hubbard was in police custody and was interrogated by police because the questions "roamed far from merely obtaining information that might assist the child's treatment."  Id. at 271.  "[T]he targeted questions," in our view,

13

"reflect[ed] a clear attempt on the part of the detective to cause defendant to incriminate himself." Id. at 272.

Our recent decision in A.A. further clarified the meaning of the "functional equivalent of interrogation." 240 N.J. at 344-45. In that case, police arrested A.A., a juvenile, and contacted his mother to come to the police station. Id. at 347, 357. Police informed A.A.'s mother of his involvement in a shooting and then brought her to the holding cell to see her son; five officers remained in the room while the two spoke. Ibid. Police did not inform A.A. of his Miranda rights in his mother's presence, and A.A. made "critical admissions to his mother" in front of police. Id. at 357. We held that A.A.'s statements were inadmissible because "[t]he police should have known it was reasonably likely that A.A.'s mother would elicit incriminating responses from him." Id. at 357-58. Relying on Innis, we explained that "A.A. was subjected to the 'functional equivalent' of express questioning while in custody" because A.A.'s incriminating statements, although made to his mother, were also made in the presence of police officers. Id. at 358 (quoting Innis, 446 U.S. at 300-01).

In several cases, the Appellate Division has found that police action was not the functional equivalent of interrogation. For example, in State v. Ramos, police asked the suspect where his glasses were. 217 N.J. Super. 530, 534

14

(App. Div. 1987).  The officers knew that the defendant wore glasses and posed the question while he was getting dressed to be taken to police headquarters, in the same way that they might have asked him where his shoes were if he had been barefoot.  Id. at 537.  The Appellate Division therefore found that Ramos's response -- that he did not wear glasses -- was admissible as a "casual remark" that did not contravene Miranda's protections.  Ibid.  The appellate court noted that "[t]he unexpected response that defendant did not wear glasses was not the result of an interrogation as to whether defendant wore glasses or not, but was a non-responsive answer to a question directed to prod defendant to finish dressing so that he could be taken to police headquarters."

Similarly, in State v. Beckler, police arrested the defendant and read him his Miranda rights at the station, but they ceased questioning when they determined "he did not understand what was happening."  366 N.J. Super. 16, 22-23 (App. Div. 2004).  While they transported the defendant to another part of the station, he "just started talking" about prior paid sexual encounters with underaged males.  Id. at 23.  The Appellate Division upheld the admissibility of those statements because, although they were "made while [the] defendant was in custody, [the statements] were unsolicited, spontaneous, and not made

15

in response to 'questioning or its functional equivalent.'" Id. at 25 (quoting State v. Ward, 240 N.J. Super. 412, 418 (App. Div. 1990)).

In other cases, the Appellate Division has found no Miranda violation when a defendant's unexpected statements to police were in response to routine questions or incident to arrest and booking. See State v. M.L., 253 N.J. Super. 13, 19-22 (App. Div. 1991) (finding no Miranda violation when police questioning was premised on concerns for a child and an incriminating response was not anticipated); State v. Mallozzi, 246 N.J. Super. 509, 516-17 (App. Div. 1991) (holding that merely informing the defendant of the charges against him during the booking process did not constitute the functional equivalent of interrogation).

### IV.

Weighing the circumstances of this case, we determine that defendant was not subject to a custodial interrogation or its functional equivalent when she spontaneously stated that she "only had two shots prior to the crash."

In Hubbard, police asked the defendant "targeted questions" which "reflect[ed] a clear attempt . . . to cause defendant to incriminate himself." 222 N.J. at 272. Here, it is undisputed that defendant was in custody at the hospital. But the record shows that no questioning occurred -- Detective Espaillat simply introduced himself. Law enforcement officers "cannot be

16

held accountable for the unforeseeable results of their words or actions" and we find that Detective Espaillat could not have foreseen that his introduction was "reasonably likely to elicit an [immediate] incriminating response." See Innis, 446 U.S. at 301-03.

Although Detective Espaillat approached defendant after she provided her medical history to hospital staff, he did not engage in what the Supreme Court termed particularly "evocative" conduct reasonably likely to yield incriminating statements from defendant. Id. at 303 (rejecting the defendant's arguments that police conduct was particularly "evocative" "under the circumstances"); cf. A.A., 240 N.J. at 357-58 (holding that, "[u]nder the circumstances, it was hardly a surprise that A.A." made incriminating statements to his mother in front of police). Rather, defendant spontaneously made an unsolicited incriminating statement while in custody, like the defendant in Beckler. The Appellate Division found in that case, and we agree, that "unsolicited, spontaneous" statements are not protected by Miranda when those statements are not made in response to questioning or its functional equivalent. Beckler, 366 N.J. Super. at 25-26.

Both the trial court and Appellate Division here relied heavily on the police presence at the time Detective Espaillat introduced himself -- three police officers in or just outside defendant's bed area. Although that fact alone

17

may establish custody, which the parties do not dispute, it does not establish interrogation.

V.

For the reasons set forth above, we reverse the judgment of the Appellate Division and remand to the trial court for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE SOLOMON's opinion.