**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4988-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ELLICK D. WRIGHT, JR.,

     Defendant-Appellant.

_____

> Submitted September 9, 2019 – Decided November 4, 2019
>
> Before Judges Rothstadt and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 14-11-1005.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Seon Jeong Lee, Designated Counsel, on the brief).
>
> Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Ellick D. Wright, Jr. of a second-degree weapons possession charge and the fourth-degree charges of obstruction and resisting arrest. The trial court sentenced him to an aggregate term of eight years, subject to a forty-two month period of parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c). Defendant now appeals from his conviction, contending that the trial court improperly denied his motion to suppress, in which he claimed his encounter with the arresting police officer was not a lawful field inquiry and that there was no reasonable suspicion to justify an investigatory stop. He also argues that the trial court erroneously barred him from playing recordings of two 911 calls to the jury that were made on the night he was arrested. For the reasons that follow, we reject defendant's contentions and affirm.

I.

We summarize the facts as developed at the suppression hearing as follows. Late at night, prior to the incident at hand, Monroe Township Canine Officer William Yorio responded to another officer, who observed a black man in dark clothing walking near a closed business in one part of the Township. When Yorio attempted to locate the man to see what he was doing, he could

2

not find the individual. Yorio stopped searching for the man and continued his usual patrol that night.

Later, at 2:42 a.m. on August 25, 2014, while on patrol in another part of town, about two or three miles away from the area he patrolled earlier, Yorio encountered defendant walking alone on an empty street where the nearby businesses were closed, except for a bar. Previously, the department had designated the area as a "point of information," due to increased criminal activity. When Yorio observed defendant, the weather "was clear and warm," but defendant was wearing dark clothing, including a black sweatshirt.

After Yorio made the stop, he radioed to dispatch. The other officer, who saw the first individual earlier in the other part of town, heard the call and asked if it was the same person. Yorio replied that he did not know and proceeded with the stop.

Yorio approached defendant, without being accompanied by his dog or removing his weapon. He asked defendant, "[h]ey, how you doing?" and whether he was from the Township. Defendant explained that he was from Philadelphia and was in the area visiting his child's mother. He voluntarily provided the officer with his Pennsylvania-issued identification and told the

officer that he did not have any outstanding warrants. The officer verified this information and held onto defendant's identification.

During the encounter, defendant "kept reaching into his waistband." In addition to his hand movements, defendant appeared nervous and was avoiding eye contact, which prompted the officer to ask if he could conduct a pat-down search for a weapon. Defendant consented and during his search, Yorio "felt a bulge" in the front waistband, lifted defendant's sweatshirt, and "saw a handgun."

When Yorio went to take the handgun, defendant pushed him away and ran, despite being told to stop and that he was under arrest. Yorio radioed to dispatch that defendant was "running" and "ha[d] a gun." There was then discussion about defendant's location. During Yorio's ensuing pursuit of defendant, the officer saw defendant reach into his waistband while running, drop the gun, and pick it up to throw it. Eventually, Yorio subdued defendant and arrested him. After defendant was arrested, a search incident to arrest was conducted, which yielded narcotics. The gun was also recovered.

A grand jury later returned an indictment charging defendant with one count of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); one count of fourth-degree obstruction of the administration of law,

A-4988-16T1

N.J.S.A. 2C:29-1(a); and one count of fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a). After the trial court denied defendant's suppression motion and ruled on the admission of the tape recordings, the matter was tried before a jury that convicted defendant on each count. Later, after the trial court denied defendant's motion for a new trial, the court sentenced defendant. This appeal followed.

On appeal, defendant argues the following points:

POINT I

THE COURT'S DENIAL OF THE SUPPRESSION MOTION WAS ERROR BECAUSE THE PATROLMAN'S ENCOUNTER WITH DEFENDANT AT 2:42 A.M. NEITHER MEETS THE FIELD INQUIRY TEST, THAT AN OBJECTIVELY REASONABLE PERSON UNDER THE CIRCUMSTANCES WOULD NOT HAVE FELT HIS RIGHT TO MOVE HAD BEEN RESTRICTED, NOR WAS THERE REASONABLE SUSPICION FOR AN INVESTIGATORY STOP. (RAISED BELOW).

POINT II

THE COURT ERRED IN BARRING THE AUDIO RECORDINGS OF THE ANONYMOUS 9-1-1 CALLS CONTEMPORANEOUS TO DEFENDANT'S ENCOUNTER WITH THE POLICE, A CLASSIC PRESENT SENSE IMPRESSION OR EXCITED UTTERANCE, AS INADMISSIBLE HEARSAY AND VIOLATIVE OF THE CONFRONTATION CLAUSE, THEREBY DENYING DEFENDANT A

5

MEANINGFUL OPPORTUNITY TO PRESENT A COMPLETE DEFENSE. (RAISED BELOW).

A. THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT DOES NOT APPLY TO THE STATE.

B. HEARSAY EVIDENCE WHERE THE DECLARANT IS UNAVAILABLE AS A WITNESS IS ADMISSIBLE IF IT IS A PRESENT SENSE IMPRESSION OR EXCITED UTTERANCE.

C. THE COURT'S ERRONEOUS AND CONFUSED EVIDENTIARY RULING DEPRIVED DEFENDANT OF A MEANINGFUL OPPORTUNITY TO PRESENT A DEFENSE.

We are not persuaded by defendant's contentions as we conclude the trial court did not abuse its discretion in denying the suppression motion or in its ruling regarding the admission of the recordings.

## II.

### A.

We turn first to defendant's challenge to the denial of his suppression motion. After defendant filed a motion to suppress, the trial court conducted a hearing at which Yorio was the only witness. The officer testified that his responsibilities included community caretaking activities, which involved investigating suspicious activity and assisting other units with his canine

6

partner. As described above, Yorio also testified to the details of his encounter with defendant, in addition to his experience and training as a police officer as it related to, among other subjects, firearms, concealed weapons, and narcotics. He testified that during the course of his training, he learned various places where weapons or contraband could be hidden on a person, including in one's waistband and the front of jeans.

Describing his initial stop of defendant, the officer explained that defendant was free to not answer his questions and noted that when he asked defendant if he would consent to a pat-down search, defendant was not under arrest. Yorio also explained that he became concerned about his safety based on his observations of defendant's nervousness and hand movements, which prompted his request to search defendant for weapons. Yorio also stated that he checked for warrants because of defendant's insistence that he did not have any.

After Yorio testified, and during oral argument, defendant maintained that he did not consent to the search and there was "no warning of the right to refuse consent in this case." Defendant also argued there was no articulable suspicion of any criminal activity or that he was nervous during his encounter as he was "just walking." The State argued that it was clear from the

A-4988-16T1

testimony that Yorio's field inquiry was not motivated by anything other than defendant's presence, the time of night, and his sweatshirt despite the warm weather. In addition, the State added that defendant's conduct of touching his waistband and avoiding eye contact made Yorio fear for his safety, thus justifying the pat-down.

On May 4, 2015, the trial court denied defendant's motion, setting forth its reasons in a thorough nine page written decision. Initially, the court stated it found Yorio to be credible as he testified consistently with his original report of the events.

According to the trial court, "the threshold question [was] whether . . . the initial stop . . . was a field inquiry, or whether it . . . [was] an unlawful investigatory stop," and it concluded the initial interaction was a lawful field inquiry. The court relied upon the fact that Yorio approached defendant while he was walking, defendant was free to not answer questions, and was not under arrest. The court also noted that Yorio was asking "foundational questions" and defendant was willing to respond. The court added that there was no inference in the record "that an objectively reasonable person would have felt his right to move ha[d] been restricted." Ibid.

The trial court also stated that an investigatory stop "would have been unlawful" because, based on Yorio's testimony, "there was no reasonable and particularized suspicion to believe that [d]efendant" was going to or "had just engaged in criminal activity." However, it concluded that the frisk was proper based upon the officer's concern that developed from the time of night and defendant's behavior, which created reasonable suspicion that defendant was armed. The court also found that because the initial search was lawful, so too was the search that followed defendant's arrest.

Later, during an in limine motion hearing, the trial court revisited its ruling, considered new evidence in the form of a transcript of Yorio's conversation with the officer who spotted the unidentified black male earlier on the same night, and additional testimony from Yorio before it again denied the motion. The issue arose when defendant contended had the trial court heard the newly produced tape recording during the suppression hearing, it would not have found that Yorio's stop of defendant was a lawful field inquiry because the recording confirmed the officer was actually conducting an investigation. In the call with Yorio, a county operator, and the other officer, after being asked whether it is "possibl[y] him" by the other office, Yorio responded that he was not sure.

9

After reviewing a transcript of the call, the trial court had Yorio recalled to testify. Under questioning by defense counsel, Yorio stated that prior to stopping defendant, he was not looking for anyone in particular in that area, including the unidentified man from earlier that evening. He described how earlier in the evening the other officer saw a black man dressed similarly to defendant, who walked past a closed business two or three miles away from where he stopped defendant.

Yorio confirmed the contents of his call. According to Yorio, he stopped defendant because "[i]t was a point of information to make contact with the public on . . . [the street] and also [defendant] was by businesses in dark colored clothing . . . ." He emphasized that defendant was not wanted for anything and he was not investigating anything about the man the other officer saw earlier in the night. Yorio confirmed that he did not mention the other individual in his report.

Yorio was also asked by defense counsel if he recalled that he made a U-turn when the other officer initially spotted the first man earlier in the night. He testified that after the other officer called in the presence of that man on the street near a closed business, he turned his car around to see where the man was. Yorio did not stop or get out of his car to pursue anyone and did not let

10

his dog out. Yorio stated that when he could not find anyone, he resumed his normal patrol duties and was no longer searching for that man or anyone specific.

Yorio noted his stop of defendant was not related to the earlier conversation or the search for the individual spotted in a different location by the other officer. Yorio further explained that when he made the initial contact with defendant and when defendant fled, no other officers were present.

Following Yorio's testimony, the trial court considered the parties' arguments about whether the stop was an investigatory stop. After considering their arguments, the trial court placed its oral decision on the record. The court found Yorio to be "extremely credible" and again found that the initial encounter was a field inquiry. It concluded that Yorio was not "searching for this individual or any other individual" while on patrol following his conversation with the other officer. The court reiterated that the frisk was also lawful, for the reasons stated in its earlier decision.

B.

Defendant argues on appeal that the trial court's denial of his "suppression motion must be reversed" because the facts did "not support [its] findings and conclusion." He contends that Yorio's "assertive and persistent

11

engagement" made him stop and become nervous. He argues that the circumstances of the encounter were such that a reasonable person in his situation would not feel free to walk away, namely after being approached in the "dead of night" while walking alone and being asked probing questions by an officer who had a large dog in his police car. Defendant maintains that there is no support in the record that this encounter could be a field inquiry but rather, was an investigatory stop. We disagree.

Our review of a trial court's denial of a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). In our review, we defer to a trial court's factual findings "because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We will "uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Sencion, 454 N.J. Super. 25, 31 (App. Div. 2018) (quoting State v. Boone, 232 N.J. 417, 425-26 (2017)). We also defer to the court's credibility findings. State v. Locurto, 157 N.J. 463, 472 (1999). "We owe no deference, however, to conclusions of law made by trial courts in suppression decisions, which we instead review de

novo." Sencion, 454 N.J. Super. at 31-32; see also State v. Hubbard, 222 N.J. 249, 263 (2015).

Applying that standard of review, we conclude that the trial court properly determined that the officer's initial stop of defendant was a lawful field inquiry, during which the officer developed a reasonable suspicion that his safety might be threatened. This justified the ensuing lawful frisk, to which defendant consented.

"A field inquiry is essentially a voluntary encounter between the police and a member of the public in which . . . police ask questions and do not compel an individual to answer." State v. Rosario, 229 N.J. 263, 271 (2017). Generally, in order to conduct a field inquiry, an officer does not need to have a well-grounded suspicion of criminal activity. Elders, 192 N.J. at 246 (citing State v. Rodriguez, 172 N.J. 117, 126 (2002)). It is permissible as long as the individual's freedom is not restricted, he is free to not respond and leave, see Rodriguez, 172 N.J. at 126; State v. Maryland, 167 N.J. 471, 483 (2001), and the questions are "not harassing, overbearing, or accusatory in nature." State v. Pineiro, 181 N.J. 13, 20 (2004) (quoting State v. Nishina, 175 N.J. 502, 510 (2003)); see also Rodriguez, 172 N.J. at 126.

The conduct of the police officer has significant weight in determining whether a field inquiry has become an investigative stop. "[T]he tenor of the police questions" can contribute to a finding that an encounter had progressed "beyond a mere field inquiry." Rodriguez, 172 N.J. at 129. The "critical inquiry" is "whether the policeman" has "conducted himself in a manner consistent with what would be viewed as a non-offensive contact if it occurred between two ordinary citizens." State v. Davis, 104 N.J. 490, 497 n.6 (1986) (quoting 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 9.2 at 53 (1978)).

"[A]uthoritative questions that presuppose criminal activity or are otherwise indicative of criminal suspicion, thus making the suspect aware he is the focus of a particularized investigation, may be considered as part of the totality of circumstances in determining whether a field inquiry has escalated into an investigatory stop." State v. Sirianni, 347 N.J. Super. 382, 389 (2002). On the other hand, if an officer puts his questions "in a conversational manner, if he did not make demands or issue orders, and if his questions were not overbearing or harassing in nature," his manner would not result in a seizure of the person. Davis, 104 N.J. at 497 n.6. "While most citizens will respond to a police request, the fact that people do so, and do so even without being told

that they are free not to respond, hardly eliminates the consensual nature of the response." Sirianni, 347 N.J. Super. at 389 (quoting State v. Hickman, 335 N.J. Super. 623, 635 (App. Div. 2000)).

On the other hand, an investigatory or Terry stop[1] is characterized by a detention in which the person approached by a police officer would not reasonably "feel free to leave," even though the encounter falls short of a formal arrest. See State v. Stovall, 170 N.J. 346, 355-56 (2002). A police officer has a right "to conduct a brief, investigatory stop," State v. Morrison, 322 N.J. Super. 147, 151-52 (App. Div. 1999); see also Terry, 392 U.S. at 20-21, if that stop is "based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Rodriguez, 172 N.J. at 126 (quoting Terry, 392 U.S. at 21); see also Davis, 104 N.J. at 504. Reasonable suspicion "involves a significantly lower degree of objective evidentiary justification than does the probable cause test," Davis, 104 N.J. at 501, and "innocent circumstances in the aggregate can support a finding of reasonable suspicion." Stovall, 170 N.J. at 368; see also Nishina, 175 N.J. at 510-11.

---

[1] Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

"[I]t is clear that a proper field inquiry . . . may escalate into a situation justifying a Terry protective search if the suspect is reasonably suspected of being armed and dangerous." Maryland, 167 N.J. at 489; see Rosario, 229 N.J. at 279-80 (Solomon, J., dissenting). "[W]here there is an insufficient basis for a protective search at the threshold of an encounter between an officer and a suspect, events occurring subsequent . . . may give rise to an objectively justified suspicion that the suspect is armed." State v. Thomas, 110 N.J. 673, 681 (1988).

Here, there was no evidence that Yorio conducted an investigatory stop instead of a lawful field inquiry. Stopping defendant was neither the result of any ongoing investigation nor any demonstrable suspicion that a crime had been or was about to be committed. Rather, as the trial court found, Yorio conducted a field inquiry before becoming concerned for his own safety based on his observations of defendant in the context of the officer's training and experience. The trial court's finding in this regard was well supported by the evidence and the court's conclusions were legally correct.

Moreover, Yorio did not ask any accusatory or authoritative questions and he did not take out his weapon or his canine dog during his initial encounter with defendant. There was no evidence that defendant was not free

16

to decline Yorio's questions and there was nothing confrontational about the encounter.

The nature of the encounter only began to change when Yorio observed defendant adjusting his waistband, appearing nervous and kept avoiding eye contact. This behavior during the lawful field inquiry, resulted in a permissible frisk. See State v. Privott, 203 N.J. 16, 29 (2010) (concluding a frisk was lawful based upon, among other factors, "[d]efendant appear[ing] nervous, walk[ing] away from the officer, and mov[ing] one hand towards his waistband"). Yorio's concern about his safety was justified based upon "his extensive experience in the field, [that made him] aware that the waistband is an area commonly used by armed persons to conceal a weapon." Ibid. As such, Yorio developed a fear for his safety and a reasonable suspicion that defendant may have a weapon based on his behavior during the encounter and his presence alone around closed businesses at 2:42 a.m. The officer's search of defendant was lawful.

III.

A.

Next, we consider defendant's contentions about the trial court's ruling regarding the two 911 calls. The admissibility of the tapes was raised by

defendant as part of an in limine motion. In his motion, defendant sought permission to use the contents of the recordings as substantive evidence that the police were harassing defendant and it was the officer and not defendant who had a weapon at the scene.

Initially, the trial court ruled that the recordings could be used, but not as substantive evidence because the recordings contained hearsay that was not admissible as present sense impressions under Rule 803(c)(1), or as excited utterances under Rule 803(c)(2), and admitting them as substantive evidence would be a violation of the Confrontation Clause. The trial court indicated that it would deliver a corresponding limiting instruction to the jury. Despite that ruling, during trial, the trial court barred defendant from playing the tapes, but indicated it would allow defendant to ask Yorio questions about the 911 calls.

The two 911 calls were evidently made by either one or two unidentified citizens after the police subdued defendant and they related to the caller's or callers' observations of the events that transpired between Yorio and defendant. In one call, the caller stated he saw a "kid had just walked right past here, a cop had just pulled him over. Something had went down. And now there's lots -- a bunch of cops jumping on one guy down here on Main

18

Street."  According to the caller, the police were "harassing the guy real badly."  The dispatcher confirmed the caller's location and the call terminated when the caller indicated he did not want to identify himself.

During the second 911 call, the caller described his location as being the same as the first caller.  He then confirmed that he saw police at the scene. The caller described what he believed was a "young guy" who "had just walked past" the caller.  The caller stated that he saw a police officer "with a dog circling around the block" before the officer "all of a sudden got the boy," who then "start[ed] running."  He then described how the police "pulled up with" and then "pulled a gun out on the boy."  In response to questions from the dispatcher, the caller confirmed it was the police who pulled out a gun and not the boy.  He stated he did not know the young boy.  The second caller also wanted to remain anonymous and the call terminated.

According to defendant, the 911 recordings were admissible under either Rule 803(c)(1) or (2) as excited utterances or present sense impressions. Specifically, he asserted that the calls were made as someone was viewing a startling condition.  With regard to the right to confrontation under Crawford v. Washington, 541 U.S. 36 (2004) and Rules 803(c)(1) and (2), there was no

requirement that the declarant be available as the callers never identified themselves.

The State disagreed, and argued for a statement to be a present sense impression it must be contemporaneous with no time to fabricate, which could render the calls inadmissible in this case. In addition, the State also argued that the callers were anonymous, which implicated the veracity of the calls. It also argued the calls did not reflect observations of a startling event or emergency as the police were already at the scene.

In its oral decision, the trial court stated it found the 911 tapes not admissible as the calls were not present sense impressions or an excited utterances. It also explained that the concept behind the Confrontation Clause applied "to everybody across the board. . . . Everybody has a right to confront[] . . . witnesses . . . ."

The court concluded that the 911 calls were not admissible under Rule 803(c)(1), as a present sense impression, because they were made after the police were already on the scene, they were not 911 "in nature in that they're reporting an emergency," and it was unclear how long the callers waited before making the calls. Likewise, the court did not find the calls to be excited

utterances under <u>Rule</u> 803(c)(2) because "[t]his was not a startling event." The callers "called [in just] to report something."

Despite finding the 911 calls inadmissible, the court stated that it would not prevent defendant from using the tapes in his case-in-chief, but stated that it would instruct the jury that "it's not substantive evidence." It explained that because the tapes were "not subject to cross-examination, [although defendant could] use them on . . . cross-examination," the jury could not "take it as gospel to establish that anything happened in regard to" them.

However, during the trial, when defense counsel attempted to play the tapes during Yorio's cross-examination, the trial court refused to allow it because they contained "hearsay," the callers were never identified, and could not be subjected to cross-examination. The court made clear that counsel could ask Yorio questions about the calls, but stated that the recordings could not be played to the jury. The court also stated that defendant could, if he chose, call Yorio as a witness during his case-in-chief and question him about his recordings. Rather than extensively questioning Yorio about the calls during cross-examination, defense counsel only elicited from Yorio that he had heard the recordings and that they related to the callers' concern that defendant

21

was being harassed. Defendant never called Yorio as a witness. Instead, defendant rested without calling any witnesses.

B.

On appeal, defendant argues that the trial court's conclusion that the 911 recordings contained inadmissible hearsay was incorrect and denied defendant's "right to a fair trial." He raises three issues: that the Confrontation Clause was wrongfully applied in favor of the State; that the calls were present sense impressions or excited utterances; and that the trial court's ruling deprived him of a meaningful "opportunity to present a complete defense." While we agree with defendant about the inapplicability of the Confrontation Clause to a court's consideration of evidence being offered by a defendant, we discern no abuse of discretion by the trial court barring the tape's admission.

Ordinarily, "[a] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion" as a "clear error of judgment." State v. Nantambu, 221 N.J. 390, 402 (2015) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). Accordingly, "absent a showing that the [trial] court abused its discretion," this court will not reverse a decision concerning the admission or exclusion of evidence unless it concludes that it "was so wide of the mark as

to bring about a manifest injustice." E&H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 24-25 (App. Div. 2018) (citing Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).  When a trial court fails to apply the proper legal standard to determine the admissibility of evidence, the court's decision is not entitled to deference and appellate review is de novo.  State v. Darby, 174 N.J. 509, 518 (2002).

At the outset, we agree with defendant that the Confrontation Clause does not apply to the State's inability to cross-examine statements made by declarants who do not testify at trial.  Both the Federal and State constitutions protect an accused's rights to due process and to confront the "witnesses against him."  U.S. Const. amends. V, VI, XIV, § 1; N.J. Const. art. I, ¶¶ 1, 10; State v. Garron, 177 N.J. 147, 168-69 (2003).  "In Crawford . . . the United States Supreme Court declared that the Sixth Amendment's Confrontation Clause prohibited the use of an out-of-court testimonial statement against a criminal defendant unless the witness was unavailable and the defendant was given a prior opportunity to cross-examine her."  State v. Basil, 202 N.J. 570, 591 (2010) (emphasis added).

The Confrontation Clause protects criminal defendants by insuring they have "the right to physically face those who testify against them," and the

ability to cross-examine their accusers before the trier of fact. <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 51 (1987). The Confrontation Clause's central purpose "is to ensure the reliability of evidence brought <u>against a defendant</u> by" testing it under the rubric of four elements: physical presence, oath, cross-examination, and observation of demeanor. <u>Maryland v. Craig</u>, 497 U.S. 836, 845-46 (1990) (emphasis added). For this reason, even "hearsay evidence that falls within an exception to the hearsay rule, may still not be admissible" against a defendant if any of the elements are not present. Biunno, Weissbard & Zegas, <u>Current N.J. Court Rules of Evidence</u>, cmt. on N.J.R.E. 802 (Gann).[2]

The same does not hold true for the State. A defendant is entitled to the admission of relevant evidence that is not otherwise barred by our rules without regard to the Confrontation Clause's protections. Here then, the only determination is whether the hearsay evidence contained in the two calls were admissible under our rules.

"Hearsay is generally inadmissible, [<u>Rule</u>] 802, except if it falls within one of the hearsay exceptions." <u>State v. Outland</u>, 458 N.J. Super. 357, 364

---

[2] However, the Clause "does not condemn all hearsay." <u>State v. Branch</u>, 182 N.J. 338, 349 (2005). "A defendant's confrontation right must accommodate 'legitimate interests in the criminal trial process,' such as established rules of evidence and procedure designed to ensure the efficiency, fairness, and reliability of criminal trials." <u>Ibid.</u> (quoting <u>Garron</u>, 177 N.J. at 169).

(App. Div. 2019) (quoting State v. Williams, 169 N.J. 349, 358 (2001)). Regardless of a declarant's unavailability, "[s]tatements that qualify as a present sense impression, [Rule] 803(c)(1), or an excited utterance, [Rule] 803(c)(2), are two such exceptions." Ibid. A present sense impression is "[a] statement of observation, description or explanation of an event or condition made while or immediately after the declarant was perceiving the event or condition and without [an] opportunity to deliberate or fabricate." N.J.R.E. 803(c)(1); Gonzales v. Hugelmeyer, 441 N.J. Super. 451, 458 (App. Div. 2015). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without [an] opportunity to deliberate or fabricate." N.J.R.E. 803(c)(2); see Gonzales, 441 N.J. Super at 458 (quoting N.J.R.E. 803(c)(2)) (concluding that a statement did not constitute an excited utterance as "no foundation [was] laid that the declarant spoke 'under the stress of excitement' without 'the opportunity to deliberate or fabricate'").

911 calls made during an emergency are typically considered hearsay statements and are only admissible in a criminal trial "subject to traditional limitations upon hearsay evidence." Davis v. Washington, 547 U.S. 813, 821 (2006). Generally, where the "911 call[] is . . . not designed primarily to

25

'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance," it may be admissible. Id. at 827 (alterations in original). That is particularly so when "any reasonable listener would recognize [the 911 caller] was facing an ongoing emergency." Ibid.

Here, both 911 calls were made while police were already present at the scene. There was no emergency that required police attention because the police were already there. Whether it was the same caller or two different individuals, there was no indication that the declarant was stressed or excited by witnessing the interaction between the police and defendant or that he did not have an opportunity to fabricate. Under these circumstances, the trial court correctly determined that the 911 calls were inadmissible.

Moreover, even though the trial court would not admit the calls, it permitted defendant to question Yorio about them on cross-examination. Yet, defense counsel who had already cross-examined Yorio for about four hours, only asked limited questions about the calls once the judge prevented the recordings from being played. Without defendant making further inquiry about the tapes as permitted by the trial court, we cannot discern how the trial court's ruling, if erroneous, impacted defendant other than barring the calls from being admitted as substantive evidence, a ruling with which we concur.

26

Finally, even if we disagreed with the trial court, we conclude barring the tapes' admission did not create a manifest injustice under these circumstances.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4988-16T1