**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1546-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SEAN LOWNEY, a/k/a
SEAN LOWMEY and
SHAWN COCHRAN,

     Defendant-Appellant.

_____

Submitted May 5, 2026 – Decided May 27, 2026

Before Judges Perez Friscia and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 22-01-0071.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Laura B. Lasota, Deputy Public Defender II, of counsel and on the brief).

William E. Reynolds, Atlantic County Prosecutor, attorney for respondent (Kristen Pulkstenis, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Sean Lowney appeals from a judgment of conviction entered on January 17, 2024, after he was found guilty by a jury of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).  We affirm.

I.

The State alleged that in the early morning hours of May 17, 2021, defendant went to the home of his ex-girlfriend, T.S., at 716 North Ohio Avenue in Atlantic City, with his then current girlfriend, Samantha Johnson.  Defendant began arguing with T.S., pulled a handgun from his waistband, fired a shot through the back door, kicked in the door, and entered the home where he continued arguing with T.S.[1]  Defendant then gave the handgun to Johnson, who concealed it in her purse.

At approximately 1:30 a.m., Atlantic City Police Department (ACPD) Officer Robert Reynolds received a ShotSpotter activation report for the 700 block of North Ohio Avenue and responded.  Nearby officers also reported hearing the gunshot.  While enroute, Officer Reynolds learned a 9-1-1 call was received from 716 North Ohio Avenue reporting a shot fired at that residence and a person with a gun was inside the home.  Officer Reynolds and other ACPD

---

[1] We utilize initials to protect the victim's privacy.  R. 1:38-1.

A-1546-23

officers detained defendant and Johnson near the residence and seized a handgun from Johnson's purse.

On January 18, 2022, defendant was indicted by an Atlantic County grand jury and charged with: (1) second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); (2) second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and (3) second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

## II.

Prior to trial, defendant moved to preclude the admission of statements he made while he was detained at the scene on May 17, 2021, which were recorded by Officer Reynolds's body worn camera (BWC). Shortly after arriving at the scene and before they found the handgun in Johnson's purse, Officer Reynolds and other ACPD officers located defendant behind T.S.'s residence and detained him. Immediately after defendant was handcuffed and before he was advised of his Miranda[2] rights, the following exchange occurred:

> Officer Reynolds: You[ are] being detained right now . . . [until] we figure out what is going on.
>
> Defendant: That[ is ] fine.
>
> Officer Reynolds: Okay, [w]here is the gun at? . . .

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[Officer Reynolds then walked away to search the area behind 716 North Ohio Avenue. He returned to the spot where defendant was being detained approximately fifty-five seconds later.]

Defendant: So, I . . . kick[ed] the door, so I kicked the window in. Boom.

Officer Reynolds: You kicked it?

Defendant: I kicked it in.

Officer Reynolds: Alright. Nobody had a gun? Nobody was shooting?

Defendant: Nobody had no gun.

Officer Reynolds: Okay.

Defendant: No, I kicked the window. That[ is] it.

Officer Reynolds: Cause we got a call saying someone was back here with a gun and they fired a shot.

Defendant: Nah, hell no.

Officer Reynolds: Alright.

Defendant: I kicked the window in.

Defendant moved to preclude his statements contending they were the product of unwarned custodial interrogation. The State argued defendant's statements were admissible pursuant to the "safety" exception to Miranda adopted by our Supreme Court in State v. O'Neal, 190 N.J. 601 (2007). On

4

August 4, 2023, following oral argument, the court entered an order denying defendant's motion supported by a written opinion. It found, after defendant was detained:

> [O]fficer [Reynolds] immediately asked . . . [d]efendant, "[w]here is the gun at?" . . . Defendant responded by stating that he kicked in the window of the door. The officer responded, "Alright. Nobody had a gun? Nobody was shooting?" The officer did not ask . . . [d]efendant any further questions.

The court determined the safety exception applied because

> [T]here was an objectively reasonable need to protect the police and the public from an immediate danger involving an unlocated handgun and . . . the only questions posed to . . . [d]efendant directly related to the danger of the unlocated handgun, which was reasonably necessary to secure public safety.

III.

The court conducted a four-day jury trial in August 2023. We summarize the relevant facts developed at trial. Relevant to the issues raised on appeal, the State called as witnesses: (1) T.S.; (2) Johnson; (3) Officer Reynolds; (4) ACPD Detective Juanita Harris; and (5) Kimberly Michalik, a forensic scientist employed by the New Jersey State Police Office of Forensic Science. Defendant did not testify or present any witnesses.

A-1546-23

T.S. testified that on May 17, 2021, she was living at her sister's residence at 716 North Ohio Avenue. In the early morning hours, T.S. was "sitting in [her] room" when she "heard somebody calling [her] name . . . out the window." She went "to the door" where she saw defendant, her "ex-boyfriend," with "another woman" who she did not know, who was later identified as Johnson. T.S. testified that she and defendant were "supposed to be" dating, but he had disappeared for about "two weeks." T.S. "felt comfortable to open [her] back door" because defendant "lived with [her]." Defendant was there to "get his things . . . [h]is clothes, his jewelry."

T.S. and Johnson "got into a[n] argument, like, who are you, and what are you doing at my house?" T.S. testified she saw defendant "standing there with a gun." After T.S. "s[aw] the gun in [defendant's] hand," she "shut th[e] door" and "ran up the steps" when a "[gun]shot went through the door." T.S. "c[ould not] say that [defendant] shot the gun" because she did not "stick around to see [any]body shoot" a gun.

After the shot was fired, defendant "kicked in the door," entered the home, and "ran up the stairs" after T.S. T.S. testified defendant was "not holding a gun" when he was inside the home. Defendant exited the home after T.S. "told

A-1546-23

him to go outside and [she would] bring [him] the clothes and stuff." T.S. testified that after the incident, there was "a bullet hole in [her] back door."

She told the officers who arrived that the female had "red braids" and defendant "was wearing a ski mask" that did not cover his face. T.S. testified she "knew of" Johnson, but "did[ not] know her" personally. Although T.S. did not identify anyone by name in her written statement to police, she testified she "of course" knew who defendant was but knew him only as "Slice." T.S. acknowledged that on the night of the incident, "[she] told police [she] only met [defendant] one time," but that was not "credible" "[b]ecause [she] was still protecting him." T.S. denied placing the call to 9-1-1. She testified she attempted to call 9-1-1, but "[her] phone was dead."

Johnson testified that on May 17, she was staying at a hotel in Atlantic City with defendant, who was her "boyfriend at the time." Around 1:00 a.m., Johnson and defendant "were supposed to go out to eat" because they "just got back together." They got into "a cab" at the hotel but Johnson did not "know where [they] were going." "The first stop [they] made" was to "somebody's house" on "Ohio Avenue." She "d[id not] know the person's house."

Johnson testified that when she and defendant arrived at the house, defendant "told [her] to wait at the corner." While waiting at the corner, she

7

"heard commotion[]."  She "walked around the building," and saw defendant and T.S. arguing.  Johnson had "met [T.S.] before," but only "in passing."

"As they w[ere] arguing, [defendant] kept saying . . . [he] need[ed his] stuff back."  Johnson testified defendant "pulled out the gun and shot at the door, went in the house, and [they] continued arguing."  He "pulled the gun out of his waistband to get into the house and shot at the screen door.  And then after he shot at the screen door, he kicked the door in and followed whoever into the house."  Johnson testified she did not know defendant had the gun.

After defendant was inside the house, there was "[a] lot of screaming and . . . yelling."  Johnson "followed after him . . . [and he] passed [the gun] off to [her], [she] put [the gun] in [her] purse, and [she] walk[ed] off."  She "t[ook] possession of the gun" because she "did[ not] want [defendant] getting in trouble."  Johnson was "stopped by police" as she "was leaving out the alleyway."  Police "search[ed]" her and found "[a] revolver in [her] bag."  Johnson was arrested and charged with unlawful possession of a handgun.

Three days later, on May 20, Johnson "ma[d]e a statement to defendant's investigator[] . . . on . . . a phone call basically telling him that [she] was going to take the charge."  She "offered to take the charge."  She told the investigator

A-1546-23

the gun found in her purse belonged to her, she was the person who fired it, and defendant was never in possession of a gun.

Johnson did not dispute she made the statement to the investigator but testified she was not telling "the truth." At the time Johnson gave her statement, she was "in contact with . . . defendant" and was "still dating" him. She was also contacted by "Taylor Murray" who she knew as defendant's "ex-girlfriend" after the incident. They "were both coming together to see what [they could] do to get [defendant] out of this situation." They were "both . . . coming up with ideas of how to get [defendant] out of the situation and that[ is] when" she said she would "take everything."

On August 3, 2023, Johnson agreed to plead guilty to second-degree unlawful possession of a handgun in exchange for a probationary sentence. As part of the plea agreement, she agreed "to be called as a witness . . . during trial" and "provide truthful testimony." Johnson also agreed "to give another statement to the prosecutor's office." She was cross-examined extensively regarding that statement.

In that statement, Johnson said that "a person named Flo was paying for the room" at the hotel where she and defendant were staying. Johnson claimed that she called Flo "Slice . . . [b]ecause he has a slice mark down his face." She

A-1546-23

"never called [defendant] Slice," and only call[ed] him "either Sean or [b]abe." She claimed "the gun belonged to Flo." Johnson stated that when she heard the commotion and walked to the rear of the residence on May 17, 2021, T.S. was "hanging out the . . . [s]econd floor window, yelling at [defendant]." Defendant was yelling and "he was getting irritated and that[ is] when he turned around and pulled [the gun] out [of] his waistband and shot at the door." "After that happened [defendant] went inside the house." Johnson "followed him" and defendant "passed the gun to" her and she "put the gun in [her] purse."

Officer Reynolds testified that when he arrived on the scene T.S. and her sister provided descriptions of the suspects and directed him to the rear of the home because "the suspects were back there." He encountered "a black female with red hair," later identified as Johnson, "walking on Magellan Avenue towards Ohio Avenue." Officer Reynolds "continued to the rear, where [he] saw [defendant] in[]between two parked cars, walking out." Defendant "matched the description provided by" T.S. and her sister. Defendant was wearing "a black hoodie . . . and . . . a black ski mask." He was detained without incident. Officer Reynolds observed "the rear door" of the home "had been broken out and there appeared to be one bullet hole through the . . . glass window in the

door."  A redacted portion of the recording from Officer Reynolds's BWC was played for the jury.

Detective Harris testified that on the night of the incident, she encountered Johnson when she "saw the female fitting th[e] description" she received on the 9-1-1 call.  After Johnson was detained, Detective Harris searched Johnson's purse, where she discovered a handgun loaded with four rounds and one empty shell.

Michalik testified as an expert in forensic DNA analysis.  Her office received DNA samples from defendant and Johnson, along with samples taken from swabs of the trigger and grip of the handgun recovered from Johnson's purse, for analysis.  The DNA profile of the samples taken from the gun showed "a mixture, meaning that there was more than one person there."  She determined "there was male DNA present" in the mixture, but she "could[ not] compare it" to the DNA samples collected from defendant and Johnson.

On August 10, 2023, defendant was found guilty of unlawful possession of a handgun.  He was found not guilty of possession of a weapon for an unlawful purpose.  The following day, he was tried separately by the same jury on the charge of certain persons not to have weapons and found guilty.  After trial, the

11

State moved for the imposition of a discretionary extended term of imprisonment as a persistent offender pursuant to N.J.S.A. 2C:44-3(a).

On October 26, 2023, the court heard oral argument and granted the State's extended term motion in an oral decision. It found defendant had prior criminal convictions for: (1) third-degree possession of a controlled dangerous substance (CDS) with the intent to distribute, N.J.S.A. 2C:35-7, in 2011; (2) second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), in 2012; (3) third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), in 2016; and (4) third-degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1), and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1), in 2019. The court found defendant also had an extensive juvenile history, including "violent offenses and weapons." It concluded "defendant's criminal conduct has continued unabated except while serving periods of imposed probation or incarceration" and he "is a persistent offender."

On November 16, 2023, the court sentenced defendant to an extended term of imprisonment of sixteen years with an eight-year period of parole ineligibility for second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1), and a concurrent term of five years with a forty-two-month period of parole eligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), for unlawful

possession of a handgun, N.J.S.A. 2C:39-5(b)(1).  On January 17, 2024, the court entered a conforming judgment of conviction.  This appeal followed.

IV.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT FAILED TO PROPERLY ADDRESS [DEFENDANT]'S REQUEST TO WAIVE HIS RIGHT TO COUNSEL AND PROCEED [SELF-REPRESENTED] BEFORE REJECTING IT.

A. [Defendant]'s Requests To Proceed [Self-Represented] And By Bench Trial.

B. [Defendant]'s Convictions Must Be Reversed Because The Trial Court Failed To Conduct The Proper Legal Colloquy And Analysis In Response To His Request To Proceed [Self-Represented].

POINT II

THE TRIAL COURT ERRED IN RULING THAT [DEFENDANT]'S UNWARNED CUSTODIAL STATEMENT TO POLICE WAS ADMISSIBLE PURSUANT TO THE PUBLIC SAFETY EXCEPTION.

POINT III

THE PROSECUTOR'S COMMENTS DURING HER OPENING STATEMENT AND SUMMATION DEPRIVED DEFENDANT OF A FAIR TRIAL.

13

POINT IV

THE EXTENDED TERM SENTENCE MUST BE REMANDED FOR RESENTENCING BECAUSE IT IS UNCONSTITUTIONAL. ALTERNATIVELY, A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE EXTENDED TERM IMPOSED IS EXCESSIVE.

    A. The Matter Must Be Remanded Pursuant To State v. Carlton.[3]

    B. Resentencing Is Also Required Because The Extended Term Imposed Is Excessive.

V.

We are unpersuaded by defendant's contention that the court failed to properly address his purported request to waive his right to counsel and proceed self-represented. Defendant did not clearly and unequivocally make such a request and, even if he did, his request would not have been timely.

Our Supreme Court has held "the United States Constitution and our New Jersey Constitution grant defendants charged with a criminal offense the right to have the assistance of counsel." State v. King, 210 N.J. 2, 16 (2012) (citing U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10). "The corollary to the right of a

---

[3] 480 N.J. Super 311 (App. Div. 2024), rev'd, 262 N.J. 629 (2026).

criminal defendant to be represented by an attorney is the defendant's right to represent himself." Ibid. (citing Faretta v. California, 422 U.S. 806, 814 (1975)).

"[A] defendant must assert the right of self-representation 'in a timely fashion' so as not to 'disrupt the criminal calendar, or a trial in progress.'" State v. Rose, 458 N.J. Super. 610, 626 (App. Div. 2019) (quoting State v. Buhl, 269 N.J. Super. 344, 362 (App. Div. 1994)). See State v. Thomas, 362 N.J. Super. 229, 240 (App. Div. 2003) (finding that the "[d]efendant's assertion of his right to self-representation was timely made, about six weeks prior to trial"). The request must be made "clearly and unequivocally," Faretta, 422 U.S. at 835, and "unambiguously . . . so that no reasonable person can say that the request was not made." Rose, 458 N.J. Super. at 627 (quoting Dorman v. Wainwright, 598 F.2d 1358, 1366 (11th Cir. 1986)).

Addressing a defendant's request to proceed self-represented is a two-step process. First, the court must determine whether the defendant clearly and unequivocally made a request to waive the right to counsel in a timely manner. Id. at 626. Second, the court must ascertain "whether the waiver is indeed knowing, voluntary, and intelligent after a searching inquiry that involves advising the defendant of the risks and pitfalls of self-representation." Id. at

627.[4]  Even when properly asserted, "the right of self-representation is not 'absolute.'"  Id. at 628 (quoting Reddish, 181 N.J. at 587).

We review a trial court's denial of a defendant's motion to represent himself under an abuse of discretion standard.  State v. Outland, 245 N.J. 494, 507 (2021).  The question of whether a defendant made a timely, clear, and unequivocal application to proceed self-represented constitutes a question of law

---

[4]  The relevant factors include:

> (1) the nature of the charges, statutory defenses, and possible range of punishment; (2) the technical problems associated with self-representation and the risks if the defense is unsuccessful; (3) the necessity that defendant comply with the rules of criminal procedure and the rules of evidence; (4) the fact that the lack of knowledge of the law may impair defendant's ability to defend himself or herself; (5) the impact that the dual role of counsel and defendant may have; (6) the reality that it would be unwise not to accept the assistance of counsel; (7) the need for an open-ended discussion so that the defendant may express an understanding in his or her own words; (8) the fact that, if defendant proceeds [self-represented], he or she will be unable to assert an ineffective assistance of counsel claim; and (9) the ramifications that self-representation will have on the right to remain silent and the privilege against self-incrimination.
>
> [State v. DuBois, 189 N.J. 454, 468-69 (2007) (citing State v. Crisafi, 128 N.J. 499, 511-12 (1992) and State v. Reddish, 181 N.J. 553, 594-95 (2004)).]

16

we review de novo.  See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (stating "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference").

At approximately 3:00 p.m. on Friday, August 4, 2023, the court heard oral argument on defendant's motion to preclude his statements to law enforcement and other motions unrelated to this appeal.  Jury selection was scheduled to begin on Tuesday, August 8.

Before oral argument began, the court addressed pretrial matters, including defendant's attire at trial.  Defendant had recently learned that Johnson pleaded guilty the day before and would testify at his trial.  He advised the court he "would like a bench trial" and became disruptive.  Defendant accused the court of "violating [his] amendments," "violating [his] rights," and alleged he did not "even have [any] discovery."  He alleged "[t]hese cops are giving the girl . . . K2 to testify against [him]" and "[t]he inmates [were] giving the girl K2 to testify against [him]."  "They [were] giving her . . . K2 through the toilet bowl to testify against [him]."

He claimed it was "illegal what [they all were] doing" because his "clothes did[ not] have possession of the gun."  Defense counsel pleaded with him to

17

"stop . . . talking about the case."  He repeated that he wanted "a bench trial, not a jury" and continued to assert he did not "have the discovery."  Defense counsel advised the court she provided defendant "with all written and electronic discovery" and "actually provided two copies of the paper discovery previously."  Defendant then claimed "somebody stole it from" him "like her family [has] been doing since."

At that point, the following exchange occurred:

> THE COURT:  Please have a seat.  Please have a seat.  Mr. Lowney, I[ am] going to tell you something.  Anything you say in this courtroom can be used against you.  I am going to make–
>
> DEFENDANT:  Yeah, use it.
>
> THE COURT:  I am going to make some suggestions for you.  Everything you[ are] telling me is exactly what [defense counsel] is going present to the jury.  [She] is representing you in a very effective manner, because I have heard these arguments.
>
> DEFENDANT:  I can go pro se.  I do[ not] need no lawyer.
>
> THE COURT:  Let me . . . finish.
>
> DEFENDANT:  I can go pro se.
>
> THE COURT:  You[ are] not going pro se.
>
> DEFENDANT:  I can go pro se.  It[ is] my right to do that.

> THE COURT: Would you listen to me for a moment? . . . I[ am] going to treat you with respect, but you have to treat me with respect.
>
> DEFENDANT: Respect me in my discovery and my [flash] drive then. . . . So I can go study my own case. She[ is] not doing her job.

Defendant then claimed he is "schizophrenic on papers. Down syndrome on papers" and had "been Down syndrome since [he] was a little boy." He had "been to speech class," "was[ not] allowed around other kids," and his "mother . . . told the school that she did[ not] want [him] taking medicine." The court advised defendant he was "obstructing [the] court proceedings."

Defense counsel asked to speak to the court at sidebar and said she was "wondering if it[ was] necessary to go through a colloquy" on "the pro se, not . . . competence." The court advised defense counsel it would "let [her] put on whatever [she] would like" and suggested they "move to motions." Defense counsel responded that she "kind of [thought] so too."

After the court addressed the pending motions, defendant repeated his demand for a bench trial. Defense counsel "ask[ed] that [the court] keep things as is" and "bring the jury in on Tuesday" and give defendant "the weekend to think about what [the court] told him" and "what [she had] told him." Defense counsel did not want to cancel jury selection "and then have [defendant] change

19

[his] mind at the last minute." The court advised defendant it was "going to bring the jury in" and give him time to consider his demand for a bench trial.

When the parties returned for jury selection on August 8, defense counsel advised the court "[she] did have further opportunity to speak with [defendant]" because "on Friday, there were some indications that he perhaps wanted to consider a bench trial in lieu of a jury trial." Defense counsel "did speak with [defendant] further [that] morning" and they were "prepared to . . . proceed with a jury."

The court then questioned defendant as follows:

> THE COURT: Mr. Lowney, you[ are] ready to proceed with a jury and select a jury today and proceed to trial?
>
> [DEFENDANT]: Yes. I am.
>
> THE COURT: . . . [T]he other day, you had mentioned a bench trial, but . . . after speaking with your attorney and reviewing the [motion] decisions from Friday and . . . thinking about it over the weekend, you[ have] decided that a jury trial[ is] best. Is that correct?
>
> [DEFENDANT]: Yes.

Having reviewed the record and defendant's statements in context, we are convinced he did not make a clear and unequivocal request to waive his right to counsel and proceed self-represented. Indeed, during the entire exchange he never once expressed a desire to waive his right to counsel. Rather, he asserted

that he "[could] go pro se" and it was his "right to do that." When viewed along with the other statements defendant made at or around the same time, his assertion that he "[could] go pro se" was not a genuine assertion of a desire to waive his right to counsel. Rather, it was an indication to the court that he could further obstruct the proceedings if he chose to do so.

Moreover, after discussing his request for a bench trial with counsel, he returned to court on August 8 and advised the court he was ready to proceed with a jury trial. Defendant had numerous opportunities to clearly and unequivocally assert his desire to proceed self-represented if he genuinely sought to do that.

Defendant's claim that defense counsel "acknowledged . . . the . . . court was obliged to address the concerns outlined in Crisafi and Reddish" is not supported by the record. After defendant's outburst, defense counsel asked to speak with the court outside the presence of defendant and said she was "wondering if it[ was] necessary to go through a colloquy." Read in context, defense counsel was questioning whether the court should have prophylactically considered defendant's comment as if it had been a legitimate request. She did not advise the court that defendant was making a genuine request to waive his right to counsel, nor did she assert such a request on his behalf.

21

Even if defendant did clearly and unequivocally make a request to waive his right to counsel, it would have been untimely. Defendant asserted he "[could] go pro se" after 3:00 p.m. on Friday afternoon, less than two business days before jury selection was scheduled to begin. When viewed in the context of defendant's conduct and attempts to disrupt the court's calendar and scheduled jury selection, defendant's request, if clearly asserted, would not have been timely. Considering the totality of the facts and circumstances surrounding defendant's statements to the court, we are convinced he did not make a timely, clear and unequivocal request to waive his right to counsel and proceed self-represented.

## VI.

We are unconvinced by defendant's contention that the court erred in ruling his unwarned statements to law enforcement on May 17, 2021, were admissible. The Fifth Amendment of the United States Constitution guarantees all persons the privilege against self-incrimination. U.S. Const. amend. V. That privilege applies to the states through the Fourteenth Amendment. U.S. Const. amend. XIV, § 1; Griffin v. California, 380 U.S. 609, 615 (1965). In addition, in New Jersey, there is a common law right against self-incrimination, which has been codified in a statute and a rule of evidence. State v. Reed, 133 N.J.

22

237, 250 (1993); N.J.S.A. 2A:84A-19; N.J.R.E. 503.  Accordingly, it has long been established that when a person "is taken into custody or otherwise deprived of his [or her] freedom," that person is entitled to certain warnings before he or she can be questioned.  Miranda, 384 U.S. at 479.

"The Miranda rule does not come into play unless a statement is the product of custodial interrogation."  State v. Elysee, 159 N.J. Super. 380, 387 (App. Div. 1978).  "Custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.'" State v. Tiwana, 256 N.J. 33, 41 (2023) (quoting Miranda, 384 U.S. at 444).  "In resolving whether police conduct constitutes interrogation or its functional equivalent, [courts] consider whether, under the circumstances, a police officer's questioning or the functional equivalent was 'particularly "evocative"' or 'reasonably likely to elicit an incriminating response.'"  Id. at 42 (quoting Rhode Island v. Innis, 446 U.S. 291, 303 (1980)).

Courts examine whether the police asked "targeted questions," which demonstrate an attempt to cause the suspect to incriminate himself or herself. See id. at 43-44; State v. Hubbard, 222 N.J. 249, 271-72 (2015); see also State in the Int. of A.A., 240 N.J. 341, 357-58 (2020).  "In the absence of interrogation,

a volunteered or spontaneous remark by a suspect is admissible in evidence regardless of the absence of <u>Miranda</u> warnings." <u>Elysee</u>, 159 N.J. Super. at 387. <u>See also</u> <u>State v. Beckler</u>, 366 N.J. Super. 16, 22-23 (App. Div. 2004) (holding statements were admissible because, although they were "made while [the] defendant was in custody, [the statements] were unsolicited, spontaneous, and not made in response to 'questioning or its functional equivalent'").

Having reviewed the BWC video in conjunction with the transcript of the video, we are convinced defendant's statement to Officer Reynolds that he "kick[ed] the door, so [he] kicked the window in" was not the product of custodial interrogation.[5] The BWC video makes clear defendant did not respond when Officer Reynolds asked him "[w]here is the gun at?" After asking that question, Officer Reynolds walked away from the spot where defendant was detained and conducted a search of the area behind T.S.'s residence. He returned to the spot where defendant was detained approximately fifty-five seconds later and before he said anything further, defendant stated he kicked the door in.

---

[5] Because "an appeal is taken from a trial court's ruling rather than reasons for the ruling, we may rely on grounds other than those upon which the trial court relied." <u>State v. Adubato</u>, 420 N.J. Super. 167, 176 (App. Div. 2011). "A trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning." <u>Hayes v. Delamotte</u>, 231 N.J. 373, 387 (2018).

Unlike the transcript, in which it appears defendant was responding to the officer's question, the BWC video shows his statement was a voluntary and spontaneous remark, not the product of custodial interrogation. Not only was the statement unresponsive to the question asked by Officer Reynolds, it was made nearly one minute later, after Officer Reynolds returned to the spot where defendant was being detained and before he said anything else to defendant. Because defendant did not make the statement in response to questioning by law enforcement or its functional equivalent, we conclude it was not the product of custodial interrogation subject to Miranda.

We are also persuaded, however, if the statement was the product of custodial interrogation, the court properly determined it was admissible pursuant to the safety exception to Miranda. We review a judge's evidentiary decisions for an abuse of discretion. Estate of Hanges v. Metro Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010).

The "safety" exception applies in "limited circumstances" and allows law enforcement personnel not to give warnings when there is an "objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." O'Neal, 190 N.J. at 617 (quoting New York v. Quarles, 467 U.S. 649, 659 n.8 (1984)).

To establish that the exception applies, the "State must generally demonstrate (1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety." State v. Stephenson, 350 N.J. Super. 517, 525 (App. Div. 2002) (citation omitted). Application of the safety exception is particularly appropriate where there exists a "concern for the protection of the public at large, or an extended group of individuals, such as children." State v. Melendez, 423 N.J. Super. 1, 24 (App. Div. 2011) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir. 1992)).

The safety exception does not nullify a person's Fifth Amendment rights. Id. at 26. Instead, it allows a narrow exception when police are trying to locate a gun, but the questioning must be focused on finding the gun and cannot be designed to elicit self-incriminating statements. See id. at 26-27.

In this case, law enforcement was investigating numerous reports of a shot fired in the area of T.S.'s residence, including the ShotSpotter activation, the 9-1-1 call, and the reports of other officers in the area. When they detained defendant behind T.S.'s residence, he did not have a gun, and they had not yet recovered the handgun from Johnson's purse.

26

Considering all the facts and circumstances of the case, we are satisfied the court did not misapply its discretion by finding the safety exception applied. At the time Officer Reynolds asked defendant about the gun, he had an objectively reasonable basis to believe there was a gun that had been discarded or hidden nearby and his single question related to the danger posed by an unsecured firearm was reasonably necessary to protect the officers and the public from immediate danger. Application of the safety exception recognized by our Supreme Court in O'Neal was warranted in this case and the court properly admitted defendant's statement on that basis.

Finally, even if admission of defendant's statement was error, the error was harmless. Constitutional errors are subject to harmless error review. See State v. Carlton, 262 N.J. 629, 643 (2026) (quoting Neder v. United States, 527 U.S. 1, 8 (1999)) ("[T]here is a strong presumption that . . . [constitutional] errors . . . are subject to harmless[]error analysis"). "Under that standard, there must be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Baum, 224 N.J. 147, 159 (2016) (alterations in original) (citation and internal quotation marks omitted).

Here, defendant only admitted to kicking in the back door of T.S.'s residence. Importantly, defendant never admitted he possessed the handgun, which was the basis for his convictions. Moreover, there was ample evidence in the record for the jury to believe he did, in fact, kick the door in based on the eyewitness testimony of T.S. and Johnson, who both testified defendant kicked the door in and entered the residence. Considering the evidence presented and the substance of defendant's admission, we discern no basis to conclude the jury was led to a verdict on the charges presented they otherwise might not have reached. We are persuaded any error, if there was one, was harmless.

## VII.

We are unconvinced by defendant's claim that the prosecutor's comments during her opening statement and summation deprived defendant of a fair trial. Defendant challenges various comments made during the prosecutor's opening statement and summation. He argues, for the first time on appeal: (1) during her opening statement, the prosecutor improperly stated that defendant "grabb[ed] a loaded .38 Special revolver and shove[d] it in his waistband" because "no witness testified at trial about having seen [defendant] arm himself with a revolver before arriving at [T.S.'s] house"; and (2) in her summation, the prosecutor improperly referred to defendant's defense as "illogical." Defense

A-1546-23

counsel did not object to those comments.

Defendant also contends the prosecutor, in her summation, improperly: (1) referred to T.S. as a victim of domestic violence; and (2) argued to the jury "there was male DNA on the gun" and they should use "deductive reasoning" to conclude "[t]hat was defendant's male DNA." These comments were the subject of objections at trial.

We review a claim of prosecutorial misconduct where defense counsel raised a timely objection for harmless error. State v. R.B., 183 N.J. 308, 330 (2005). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Id. at 333 (quoting State v. Frost, 158 N.J. 76, 83 (1999)). When a defendant does not raise a claim at trial, we analyze the belated objection under the plain error standard. R. 2:10-2. To determine whether a prosecutor's improper comments in summation warrant reversal, we assess whether the impropriety was "so egregious that it deprived the defendant of a fair trial." State v. Jackson, 211 N.J. 394, 409 (2012) (quoting Frost, 158 N.J. at 83).

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Williams, 471 N.J. Super. 34, 43 (App. Div. 2022) (quoting

Frost, 158 N.J. at 82). "A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times [their] 'remarks and actions [are] consistent with [their] duty to ensure that justice is achieved.'" Jackson, 211 N.J. at 408 (first and third alterations in original) (quoting State v. Williams, 113 N.J. 393, 447-48 (1988)).

It is well-recognized that "[p]rosecutors may not make inaccurate factual or legal assertions during summation, and they must confine their remarks to evidence revealed during trial, and reasonable inferences to be drawn from the evidence." State v. Rodriguez, 365 N.J. Super. 38, 48 (App. Div. 2003). "'[R]eferences to matters extraneous to the evidence' may constitute prosecutorial misconduct." State v. Williams, 244 N.J. 592, 607 (2021) (quoting Jackson, 211 N.J. at 408).

Nevertheless, not every prosecutorial misstep requires a new trial. State v. Garcia, 245 N.J. 412, 436 (2021). "[P]rosecutors are expected to make '"vigorous and forceful" presentations during opening statements and summations.'" State v. Butler, ___ N.J. ___, ___ (2026) (slip op. at 18) (quoting Williams, 244 N.J. at 607). "Only when the prosecutor's conduct in summation so 'substantially prejudice[s] the defendant's fundamental right to have the jury

30

fairly evaluate the merits of his defense' must a court reverse a conviction and grant a new trial." Ibid. (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

"In deciding whether prosecutorial conduct deprived a defendant of a fair trial, 'an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Supreme Life, 473 N.J. Super. 165, 172 (App. Div. 2022) (quoting Williams, 244 N.J. at 608). Overall, a court "must assess the prosecutor's comments in the context of the entire trial record," State v. Nelson, 173 N.J. 417, 472 (2002), including whether the trial was lengthy, and the prosecutor's remarks were short or "errant." State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991).

Defendant's claim that the prosecutor, in her opening statement, improperly told the jury defendant armed himself at the hotel before going to T.S.'s house lacks merit. "A prosecutor's opening statement 'should provide an outline or roadmap of the State's case' and 'should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence.'" State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (emphasis removed) (quoting State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004), certif. denied, 182 N.J. 148 (2004)). Here, Johnson testified she and defendant drove

from the hotel to T.S.'s house where he pulled the handgun from his waistband. The prosecutor's statement that she expected the evidence to show defendant armed himself at the hotel before driving to T.S.'s house was supported by Johnson's testimony at trial and was not improper.

We are similarly unpersuaded by defendant's claim that the prosecutor improperly referred to his defense as "illogical." Specifically, she argued defendant's claim that Johnson "armed herself, got with her boyfriend . . . [defendant] and then [went] to a stranger's house to shoot them" was not "logical," and his claim that "if no officer saw [him] with the gun that it[ is] impossible to have happened . . . [wa]s simply illogical."

We are convinced these statements were not improper. "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses" and "is permitted" to respond. State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000) (citing State v. C.H., 264 N.J. Super. 112, 135 (App. Div. 1993)). Here, the prosecutor fairly commented on defense counsel's arguments, which she contended were illogical based on the evidence presented at trial.

We are also persuaded the prosecutor's reference to T.S. as a victim of domestic violence was not improper. The State alleged defendant fired a gun through the window of T.S.'s home, kicked her door in, and entered her home

32

during a heated argument. Additionally, T.S. testified she and defendant had a dating relationship. The characterization of T.S. as a victim of a "domestic violence shooting[] in her home" was a fair comment on the evidence presented at trial. Even if the statement was improper, we are convinced it was harmless because there is no basis to conclude it led the jury to a verdict it otherwise might not have reached. Baum, 224 N.J. at 159.

The prosecutor's comments regarding the DNA evidence skirted the line between fair comment and misconduct. Michalik testified there was male DNA found on the gun, but she was unable to determine the number of contributors and could not match the DNA on the gun to defendant. Although the prosecutor did not misrepresent Michalik's testimony, she argued to the jury "[u]sing deductive reasoning, we know whose male DNA was on the gun. That was defendant's male DNA." The prosecutor's claim that "deductive reasoning" showed it was defendant's DNA on the gun stretched the considerable leeway prosecutors are afforded in making closing arguments to the breaking point.

Even so, having reviewed the statement in the context of the entire trial record, we are satisfied it did not substantially prejudice his "fundamental right to have the jury fairly evaluate the merits of his defense." Butler, ___ N.J. at ___ (slip op. at 18). The State presented two eyewitnesses who testified

defendant pulled the gun from his waistband and fired it through the back door of T.S.'s home. Defendant was detained at the scene and there were no issues relating to the eyewitness' identification of defendant. Based on the trial record as a whole, there is no basis to find the prosecutor's statement regarding DNA evidence led the jury to a verdict it otherwise might not have reached and was, therefore, not harmful. Baum, 224 N.J. at 159.

## VIII.

Defendant's contention that his extended-term sentence for second-degree certain persons not to have weapons must be remanded based on the United States Supreme Court's decision in Erlinger v. United States, 602 U.S. 821, 835 (2024), is not convincing.

In Erlinger, the Court held that a defendant is entitled under the Fifth and Sixth Amendments to have a jury unanimously determine, beyond a reasonable doubt, whether the defendant's past offenses were "committed on occasions different from one another" under the federal Armed Career Criminal Act, 18 U.S.C. § 924(e). 602 U.S. at 835. Applying principles first announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), the Court reiterated "there is no doubt what the Constitution requires in these circumstances: Virtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant

is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Erlinger, 602 U.S. at 834 (alteration in original) (quoting Apprendi, 530 U.S. at 490).

It is not disputed that Erlinger abrogated New Jersey's persistent offender statute to the extent N.J.S.A. 2C:44-3(a), as presently drafted, provides that certain predicate facts are to be found by a court rather than a jury. However, our Supreme Court in Carlton, 262 N.J. at 629, concluded that "errors in failing to submit sentencing factors or elements to a jury, as in Apprendi and its progeny, are presumptively subject to harmless error analysis, not automatic reversal." Carlton, 262 N.J. at 643. The Court thus held that the harmless constitutional error doctrine applies to Erlinger violations provided that "the relevant facts are undisputed, the sentencing court's reasoning fully articulated, and the record demonstrates, beyond any reasonable doubt, the sole conclusion a jury could have reached had Erlinger been in place at the time of sentencing." Id. at 644. Stated another way, the record must demonstrate that only one outcome would have been possible at trial. Id. at 645.

Pursuant to N.J.S.A. 2C:44-3, a defendant "convicted of a crime of the first, second, or third degree" may, "upon application of the" prosecutor, be

sentenced to an extended term of imprisonment if the defendant is found to be a

"persistent offender."

> A persistent offender is a person who at the time of the
> commission of the crime is [twenty-one] years of age
> or over, who has been previously convicted on at least
> two separate occasions of two crimes, committed at
> different times, when he was at least [eighteen] years of
> age, if the latest in time of these crimes or the date of
> the defendant's last release from confinement,
> whichever is later, is within [ten] years of the date of
> the crime for which the defendant is being sentenced.
>
> [N.J.S.A. 2C:44-3(a).]

In this case, the relevant facts are undisputed, the sentencing court's

reasoning was fully articulated, and the record demonstrates, beyond any

reasonable doubt, the sole conclusion a jury could have reached had Erlinger

been in place at the time of sentencing is that defendant was a persistent

offender. In its October 26, 2023 oral opinion granting the State's motion for an

extended term, the court found defendant, who was over twenty-one years of

age when the offenses at issue in this case were committed, had previously been

convicted of at least four second- and third-degree crimes committed at different

times on at least four separate occasions between 2011 and 2019, when he was

at least eighteen years of age. In addition, the latest of these prior crimes was

committed on March 23, 2017, which was well within ten years of the date of the crime for which defendant was being sentenced, May 17, 2021.

The court's findings are amply supported by defendant's undisputed adult presentence report and defendant does not contend otherwise. Pursuant to Carlton, we are satisfied the Erlinger violation in this case was harmless and remand is unnecessary.

Defendant's claim that the sentence imposed in this case is excessive lacks merit. Our "standard of review of a sentencing decision is well-established and deferential." State v. Vanderee, 476 N.J. Super. 214, 235 (App. Div. 2023), certif. denied, 255 N.J. 506 (2023). We review a trial court's sentencing decision under an abuse of discretion standard. State v. Konecny, 250 N.J. 321, 334 (2022). "We 'must not substitute [our] judgment for that of the sentencing court.'" Vanderee, 476 N.J. Super. at 235 (alteration in original) (quoting State v. Liepe, 239 N.J. 359, 370 (2019)).

In determining a sentence for imprisonment, the sentencing judge must consider the aggravating factors delineated in N.J.S.A. 2C:44-1(a)(1)-(15) and the mitigating factors set forth in N.J.S.A. 2C:44-1(b)(1)-(14). "[A] trial court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant

factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989). "[A]n appellate court should not second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record." Id. at 216.

In this case, the court found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (the risk defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (the extent of defendant's prior criminal record); and nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter defendant and others from violating the law), applied. The court did not find any applicable mitigating factors applied and determined the "[a]ggravating [f]actors preponderate[d] over the lack of [m]itigating [f]actors."

The court's findings regarding the aggravating and mitigating factors are supported by substantial evidence in the record, and the court appropriately applied and balanced those factors in imposing its sentence. Defendant's claim that the court double counted the aggravating factors because it sentenced defendant to an extended term is incorrect. The aggravating factors the court applied were not duplicative of any elements of the offenses for which defendant was sentenced. In addition, the persistent offender statute requires only two

prior adult convictions to render defendant eligible for an extended-term sentence, whereas defendant had four prior adult convictions and an extensive juvenile record. In these circumstances, the sentencing court was free to consider the other two convictions and his juvenile record for the purpose of finding aggravating factors without even potentially running afoul of the double-counting prohibition. The court properly applied the aggravating factors in imposing the extended-term sentence. There is no reason for us to conclude the court misapplied its discretion in doing so.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

39